**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

LKG/AS
F#: 2015R01691

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 15, 2019

By Hand and ECF

The Honorable Carol B. Amon
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Scott Brettschneider, et al.
Criminal Docket No. 18-123 (CBA)

Dear Judge Amon:

The government respectfully submits this letter in advance of defendant Reginald Shabazz-Muhammad's sentencing, scheduled for January 25, 2019, at 10:00 a.m. For the reasons set forth below, the government recommends that the Court sentence the defendant within the applicable 0 to 6 months Guidelines range.

## I. Background

The defendant pled guilty to Count Two of a two-count indictment, for making false statements to the Bureau of Prisons ("BOP"). Presentence Investigation Report ("PSR") ¶ 1. The charge stemmed from a letter the defendant wrote on behalf of a sentenced federal inmate, co-defendant Richard Marshall, to assist Marshall in fraudulently gaining entry into the Residential Drug Abuse Program ("RDAP"). Id. RDAP is a treatment program sponsored by the BOP and is available to sentenced inmates who have a verifiable diagnosis of a substance use disorder within the year preceding their arrest.[1] Id. ¶ 3. An inmate who successfully completes the RDAP program is eligible for early release, receiving as much as a year off his sentence. Id. ¶ 3, n.1.

[1] The BOP uses the one-year demarcation point because, according to the DSM-V, an individual is in remission for substance use disorder if they go a year without abusing such substances.

At the time, Marshall was in custody following his conviction in United States v. Wright et al., 12-CR-014 (N.D.N.Y) (FJS), a 16-defendant drug conspiracy case. In Wright, Marshall was charged and pled guilty to distributing at least 280 grams of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). Scott Brettschneider—another co-defendant in this case—represented Marshall in Wright. And at the time the defendant authored the fraudulent letter to BOP, he was employed by Brettschneider as a paralegal. Id. ¶ 64.

Despite what the letter said, the defendants charged in this case knew that Marshall did not have a recent history of substance or alcohol abuse. In his sentencing submission in Wright, Brettschneider asked that Marshall be sentenced to home or community confinement, which could include an alcohol or drug rehabilitation center. Id. Docket Entry No. 336 at 6. The request was based on the non-violent conduct for which Marshall had been convicted and his criminal history, rather than any history of substance abuse. Brettschneider also submitted a report (publicly-available) from a psychologist who evaluated Marshall. The report stated that after recovering from depression earlier in his life, Marshall had been "clean and sober for over 20 years." Id. Docket Entry No. 338 at 6. At sentencing, Brettschneider told the court that he had known Marshall for 20 years and represented that in that time, Marshall had led a "clean life," free of crimes save for a 2007 marijuana arrest. Marshall was sentenced in August 2014 to 36 months' imprisonment.[2]

Shortly after Marshall began his term of incarceration, the defendants in the instant case submitted the fraudulent letter to the BOP stating Marshall had an active drug dependence on alcohol and marijuana. They did it because, as co-defendant Charles Gallman put it on a phone call, a letter like that would "knock a year off [Marshall's] sentence," but, he added, would cost $300.

The plot to obtain the fraudulent letter was revealed on intercepted calls obtained through a wiretap authorized by a state court on Gallman's phone. In an October 24, 2014 call, Marshall explained to Brettschneider that he needed a letter from a "drug program," to which Brettschneider responded, "alright, alright, we'll work on that Monday. Ok I know who to talk to." Marshall outlined to Brettschneider what he wanted from the letter: it had to be on the letterhead to "look real official [be]cause they don't want no bullshit over here. Well listen, it can't be . . . for the last year, it's got to be a year before, you know, before I got locked up, within that year so." Brettschneider knew the year, "2011," he confirmed. Continuing his instructions, Marshall noted that the letter should state that he has been "drinking forever," even before the arrest, and that he was "relapsing and stuff." He implored Brettschneider to get the letter quickly so that it would get him out of prison earlier, "next year," he believed.

---

[2] Marshall escaped the statutory mandatory minimum penalty because he was eligible for and received "safety valve" treatment pursuant to (l)-(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases).

In the three-way call, Gallman reassured Marshall that "we'll get it to you next week," a belief Brettschneider echoed ("alright, we'll get it" and, later, "I am on it, I am on it, I'll take care of it for Tuesday"). Later, Brettschneider told Marshall that he found the person who would author this fraudulent letter. "He's gonna do it," Brettschneider said, referring to the person he apparently had recruited on short notice. As it turned out, the person who would write about Marshall's prior drug treatment was the defendant Shabazz-Muhammad—one of Brettschneider's legal assistants.[3]

That same month, in November 2014, United States Penitentiary Lewisburg received a letter signed by "Reginald Shabazz-Muhammad, CASAC CLA, Director Of Program Services," detailing Marshall's purported treatment at the "Muhammad Mosque No. 7." The letter, dated November 6, 2014, was postmarked November 20, 2014, from Jamaica, Queens. It stated that Marshall was involved in an outpatient program described as a "community outreach program" run by Muhammad Mosque No. 7 from October 2003 through January 2010, and explained that Marshall was "suffering from active drug dependence, namely alcohol and marijuana." The letter, prepared by the defendant, stated that Marshall had been "making progress gradually reducing his active substance dependence."

About two weeks passed before Marshall called Gallman again, on December 5, 2014. Marshall explained that the BOP required progress reports[4] to accompany the letter. Gallman believed those could be fabricated too: "Ok she wants progress notes so we got to find somebody to make them up"; he promised to follow up with "Scott's [Brettschneider] man." Marshall offered to send Gallman samples from a fellow inmate, to give a "general idea" of what the progress reports should look like. On the same day, Marshall called Gallman to add another complaint: the January 2010 date in the letter, describing when the Marshall had received treatment, is "not gonna fly" because "it's gotta be a year within [when] I got arrested, so it has to be like 2011 in the summer time." Marshall continued "brainstorming" about creating progress reports and requested that he not just have a report about one session. Gallman agreed that they would "spread it out over a period of time."

The following day, Marshall told Gallman that he forwarded two samples "to show what a dude had to do while he was here" to get into the program, though Marshall recommended that they "put it in your own language." Brettschneider joined the call and immediately asked Marshall if he had gotten into the drug program. Marshall responded that he still needed to produce progress reports. Brettschneider sounded optimistic: "I'm sure he must have session notes." Marshall added that the treatment period in the letter should also

[3] Brettschneider would later describe Shabazz-Muhammad as a dependable worker, willing to do hours of grunt work: "He's a guy that he'll stand there copy 500 pages for me and put together a loose leaf, you know, for trial."

[4] Progress reports, also referred to as session notes, are contemporaneous notes made by the treatment provider documenting that the service provider delivered certain diagnostic and/or treatment services to an individual.

be changed to end in 2011 because "it gotta be a year prior to my arrest." Brettschneider responded "let me talk to him, let me reach out to him on Tuesday." Marshall added that the treatment period in the letter should also be changed to end in 2011 because "it gotta be a year prior to my arrest." Brettschneider responded "let me talk to him, let me reach out to him on Tuesday."

Despite repeated attempts by Gallman, however, by this point the defendant stopped returning his calls. Gallman and Brettschneider described how odd it was that the usually-dependable defendant had gone missing, though Brettschneider also recognized that what Marshall was "looking for . . . that's not really that easy to—." Marshall was ultimately not able to secure the progress reports and did not get into the program.

## II. Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 50 (citation and footnote omitted). Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]." The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed to:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, 18 U.S.C. § 3661 provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## III. Guidelines Calculations

The government submits that the Guidelines calculation set forth in the PSR and the plea agreement should be applied, resulting in an advisory Guidelines range of 0-6 months, based on the following calculation:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Less: Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Total: | 4 |

## IV. Discussion

The "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and the need for general and specific deterrence, 18 U.S.C. § 3553(a)(2), weigh in favor of incarceration. The Court must send a message to deter others from assisting other defendants in fraudulently gaining entry into the RDAP program to shave time from their sentence. As the Court is aware, many defendants assert at sentencings that they need drug treatment—often citing self-reported histories of abuse—and ask that the district judge recommend to the BOP that it provide such treatment. The government almost never opposes because it rarely has evidence refuting defendants' assertions. Still more defendants, like Marshall, apply for the RDAP without having made any record of substance abuse at sentencing. Either way, the BOP is left without any meaningful way to fully vet the thousands of applications that it fields from applicants. See, e.g., United States v. McDonough, 233 F. Supp. 3d 231, 236, 239 (D. Mass. 2017) (quoting testimony of BOP doctor recognizing that inmates have an "incentive to lie to get into the program and obtain a reduction in their sentence," and noting that the defendant had been improperly admitted into the RDAP program).

In this case, the Queens County District Attorney's Office happened to be wiretapping Gallman's phone because he was committing witness tampering with criminal defense attorneys. It stumbled on the RDAP-related fraud during the course of this interception—a fortuitous discovery that this particular defendant is unlikely to repeat. Nevertheless, there is a significant value in sending a message to others in the legal community that committing fraud on the BOP will have serious consequences. It may be the only mechanism to discourage this crime.

Deterrence is also needed to support a worthy BOP program that provides the treatment many defendants need to rehabilitate. The incentive of earlier release encourages defendants to self-report substance abuse, and seek and complete treatment. Without punishing individuals like the defendant who try to game the system, the BOP would fill precious spots meant for inmates in need of treatment with inmates like Marshall who simply want to serve less time than what they had been sentenced to.

The defendant is keenly aware of the scarce resources that are well-spent on defendants battling substance abuse. The defendant—now a four-time convicted felon—is a recovering addict himself, who has helped others battling the same problem. With that history, it is concerning that the defendant committed the instant offense in his 60s simply because, as he puts it, he was "tasked by his employer Mr. Brettschneider to complete the letter[.]" Def. Ltr. at 2.

The defendant put time and effort into doctoring the letter to make it look convincing. He held himself out as the "Director of Program Services" at the Mohammad Mosque No. 7, which is in fact a legitimate mosque in Manhattan. Yet according to the defendant's employment record, he never worked at that mosque. See PSR ¶¶ 63-66. In the fraudulent letter, the defendant not only lied about who he was and where he worked, but he also lied about his familiarity with Marshall's purported history of drug and alcohol dependence. Id. ¶ 8.

Nevertheless, as it did with Marshall, the government is not taking a position where within the Guideline range the Court should sentence the defendant. As with Marshall, the defendant's record and the need for general deterrence compelled the government to insist on a plea agreement that allowed it to make a specific recommendation. But a review of the PSR and the defendant's submission, offer reasons not to incarcerate the defendant. The defendant has maintained steady employment for the last decade and has even managed to continue supporting himself through contract work through the pendency of this case. Id. ¶ 63. The defendant's criminal record—which shows a break from criminal activity in his mid-30s to his early 60s—and work history show that the defendant has long been on the right track, before his employer, Brettschneider, asked him to commit a federal felony. Additionally, the defendant apparently saw the error of his ways and cut off contact with Gallman when Gallman and Brettschneider asked him to perpetuate the fraud by creating false session notes. As a result, the government is not taking a position where within the applicable Guidelines' range the Court should sentence the defendant.

V. Conclusion

For the reasons set forth above, the government respectfully submits that the Court sentence the defendant to a sentence within the 0-6 months' Guidelines range.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/
Lindsay K. Gerdes
Andrey Spektor
Assistant U.S. Attorneys
(718) 254-6155/6475

cc: Donald duBoulay, Esq. (by ECF)
Clerk of the Court (CBA) (by ECF)