UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA  :  18-CR-00123

   -against-  U.S. Courthouse
   :  Brooklyn, New York
JOHN SCARPA,

       Defendant,  :
               September 23, 2019
- - - - - - - - - - - - - - X  11:15 o'clock a.m.

         TRANSCRIPT OF SENTENCE
         BEFORE THE HONORABLE CAROL B. AMON
         UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:  RICHARD P. DONOGHUE
                    United States Attorney
                    147 Pierrepont Street
                    Brooklyn, New York 11201
                    BY:  ANDREY SPEKTOR
                         KEITH EDELMAN
                         LINDSAY GERDES
                    Assistants U.S. Attorney


For the Defendant:  ANTHONY COLLELUORI, ESQ.
                    THOMAS KENNIFF, ESQ.


Court Reporter:  Anthony M. Mancuso
                    Official Court Reporter
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    (718) 260-2419


Proceedings recorded by mechanical stenography.  Transcript
Produced By Computer Aided Transcription

(Case called; both sides ready.)

MR. SPEKTOR:  Andrey Spektor, Keith Edelman and Lindsay Gerdes for the United States.

THE COURT:  Good morning.

MR. COLLELUORI:  Anthony Colleluori for the defendant.

MR. TURTON:  Jamie Turton from probation.  Good morning.

THE COURT:  All right.  Everyone can be seated.

I think we had some confusion this morning and we were delayed in starting because, Mr. Colleluori, my courtroom deputy told me you wish to speak today but there was not a notice of appearance filed.  You know how that was a problem.

MR. COLLELUORI:  I don't, your Honor.  As the court may remember, I was the original attorney on the matter when the case was pre-arrest and I became ill and I'm still ill, doing better, I did not participate in trial because I was too ill at that point to come to court.  As you can see, the last time I appeared before you in a different chair, I'm wheelchair bound now and in final stages of renal failure.  I don't make court appearances very often.  I guess my secretary didn't realize I needed to be on the docket because I was not coming to court again.  I was getting ECF on the case.  I don't why I didn't get added.

THE COURT:  You have to add yourself.  You have to

file a notice of appearance.

MR. COLLELUORI:  My secretary usually files it on my behalf.

THE COURT:  Okay.  Apparently, it's been ironed out now and it's been filed.

MR. COLLELUORI:  I apologize to the court.

THE COURT:  That's all right.

We have a number of matters this morning.  I think the first matter that we need to take up is there are outstanding Rule 29 and Rule 33 motions and I have carefully reviewed those motions and let me just state for the record initially on May 23 of this year the jury returned its verdict on a two-count indictment that charged the defendant with one count of using interstate facilities to commit bribery and one conspiracy count, conspiracy to use interstate facilities to commit bribery and the jury found Mr. Scarpa guilty on both of those counts.

There is a motion before the court under both Rule 29 and Rule 33 to set aside the verdict and to enter a judgment of acquittal or for a new trial.  In reviewing a defendant's Rule 29 motion for acquittal on the ground that the trial evidence was insufficient as a matter of law the court is obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for

the jury not a reviewing court and that well-settled principle is stated in many case but in particular the quote I just read comes from a case United States vs. Florez, 447F.3d 145 at pages 154 and 55. A defendant must prove that, viewing all of the evidence in the light most favorable to the government, no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.

The Second Circuit has noted the defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient. United States vs. Murgen, 764F.3d 199 at page 204 to 205, a Second Circuit decision of 2014.

Turning to the test for a Rule 33 motion, the ultimate test is whether letting a guilty verdict stand would be a manifest injustice. There must be a real concern that an innocent person may have been convicted. That is United States vs. Persico, 645F.3d 85, 109, Second Circuit decision of 2011.

A district court may itself weigh the evidence and the credibility of witnesses but in doing so it must be careful not to usurp the role of the jury. Rule 33 motions are disfavored in this circuit and the standard for granting such a motion is strict. That well-settled principle is stated in United States vs. Gambino, 59F.3d 353-364, Second Circuit decision of 1995.

In this case the court denies both the Rule 29 and the Rule 33 motions because in this court's view the defendant has failed to satisfy either standard.

With regard to Rule 29, the defendant has not shown that no rational trier of fact could have found the essential elements of the crimes charged. The government in its memorandum filed on June 13, 2019 goes through a thorough and pains staking and accurate review of the evidence that conclusively demonstrates that defendant has failed to establish that viewing the evidence in the light most favorable to the government that no rational trier of fact could have found the essential elements of the crimes charged.

And I reviewed as well the defendant's submission and I think that the defendant's submission -- is largely more of a summation -- which fails to recognize the standard and is really asking the court to draw inferences favorable to him, which of course is not the appropriate standard.

The principal argument is that there was evidence insufficient to support the jury's finding that a benefit was knowingly offered or accepted by Cherry. However, it was certainly rational for the jury to infer from the evidence presented at trial that the defendant participated in the scheme to offer a bribe to Cherry to testify falsely and there was proof of the type of benefit that was offered through the tape-recordings of Mr. Gallman, who was shown to be a

co-conspirator, that the benefit that was to be offered was to enhance happens the witness' prestige in the prison's setting. He was facing an extraordinarily long term of imprisonment with little help of any benefit other than that and also there was the benefit that was offered was assistance in his appeal. The fact that the defendant ultimately didn't file an appeal for him is not dispositive because the benefit merely has to be offered. It doesn't have to actually be conferred.

But the telephone conversations that I think most accurately point out the defendant's understanding of the role and scope of the offer and his involvement in it -- just to point out two among a number -- is Exhibit 10 which the government has referred to in which the defendant says, Mr. Scarpa says, So this guy's willing to do whatever, and Mr. Gallman responds, Whatever you need, John, whatever you need. The defendant says, Okay, you got it. Mr. Gallman replies, Whatever you need. I got a bunch of stuff I wrote down. I, because I don't think, it's something about a Newport pack. Mr. Gallman later goes on and says well, I've wrote a bunch of stuff down and I'll be able to give it to you when I get there.

Later on in Exhibit 18 there is an additional conversation between Mr. Scarpa and Mr. Gallman which also supports the existence of this conspiracy and to use the facilities of interstate communications which in this case

were the cellphone communications. Mr. Gallman says, I think it's going to play out just like you said. He's going to win one and lose one. Yes. That's a possibility. And then if I can win the other one on appeal -- this is Mr. Scarpa talking -- you know. So that referred quite clearly to the two murder charges against Mr. Scarpa's client.

So the evidence and the inferences to be drawn from the evidence support the fact that there was this bribery scheme, that the bribe was offered, that the defendant Cherry did his part by lying at the trial, which was what was being requested of him. One could draw the inference that he wouldn't have done something like that had a benefit not been offered.

Also, particularly, I think important in the evidence was the defendant's reaction when he learned during the time that that perjured testimony was being offered, that the DA had become aware of the fact that Mr. Gallman had met with Mr. Cherry and his reaction to that as being extraordinarily upset about that also is evidence from which the jury could infer his participation both in the bribery scheme and the conspiracy.

So I'm denying the Rule 29 motion. In terms of the Rule 33 motion, the court is not persuaded that I should view the evidence any differently from the way that the jury viewed it to prevent a manifest injustice. The court would have

reached the same conclusion having heard the evidence the jury heard -- would have reached the same conclusion as the jury has given.  I don't find that there was any manifest injustice here.  That disposes of the outstanding Rule 29 and Rule 33 arguments.

That takes us to obviously the most important matter that the court has to address today, which is sentencing.  And the first thing that I want to confirm is that that I have received all of the papers that the parties had submitted in connection with the sentencing.

I have received a probation report and an addendum to the probation report; from defendant I have received a submission dated September 4, 2019 and then there are additional submissions, two I believe, one September 19 and one September 20, which consist of character letters; with regard to the question of sentencing as well I have the government's sentencing memorandum.

Does the government believe that from their perspective that there are any documents that I should have that I have not mentioned?

MR. SPEKTOR:  No, your Honor.

THE COURT:  Counsel.

MR. COLLELUORI:  Only that there's two government memorandums.

THE COURT:  With respect to sentencing?

MR. SPEKTOR:  Only one.

THE COURT:  There's a government memorandum on the Rule 29 and Rule 33 issue.

MR. COLLELUORI:  I understand.

THE COURT:  But the sentencing I thought was just one.

MR. SPEKTOR:  Are you referring to the objections to the presentence report?

MR. COLLELUORI:  Right.  There were objections that were filed and there was a second letter.

MR. SPEKTOR:  The objections went to probation and they were separately docketed.  There was only one sentencing memorandum that we filed.

MR. COLLELUORI:  Which would be the one that you filed.

MR. SPEKTOR:  On the 13?

MR. COLLELUORI:  On the 13.

THE COURT:  That's all that the government has submitted?

MR. SPEKTOR:  That's correct.

THE COURT:  Have I accurately characterized the defendant's submissions or do you believe that you have submitted something else?

MR. COLLELUORI:  No.

THE COURT:  I just would make one comment with

respect to the recent character letters that the court has received. One of the character letters makes a legal argument. I'm not going to entertain legal arguments made in character letters. Counsel, I think you understand that.

MR. COLLELUORI: Of course. That's my job.

THE COURT: Yes.

MR. COLLELUORI: I have to save something for me to do.

THE COURT: Yes.

All right. Let me also inquire: Mr. Scarpa, did you read your presentence report?

THE DEFENDANT: I did, your Honor.

THE COURT: And did you have the opportunity to discuss the contents of that report with your counsel?

THE DEFENDANT: We did, your Honor.

THE COURT: And have you also seen the revision to the presentence report?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you discuss that as well?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied to have counsel representing you at this proceeding today?

THE DEFENDANT: Yes, your Honor, I am.

THE COURT: Counsel, let me ask you: I know that there is an issue with respect to the addendum to the

presentence report.  But are there any other factual matters that you challenge in the presentence report?

        MR. COLLELUORI:  In the original presentence report?

        THE COURT:  Yes.

        MR. COLLELUORI:  I believe we agreed with the --

        THE COURT:  The guideline calculation.

        MR. COLLELUORI:  The addendum we don't agree with, which basically mirrors the requests of the government made less stringently than in their letter to the court, they made in their original letter to probation.

        THE COURT:  Okay.  Apart from the guideline calculation, which I'll turn to next, are there any other objections to other material in the presentence report?

        MR. COLLELUORI:  To the extent that there are issues with some of the factual bases for things, there are a number discussed in relation to the sentencing memorandum the government has put in.  My feeling on this is that some of the issues here are taken out of context and by taking them out of context they lead to a much different view of the evidence than what I believe actually happened.  And so I think that it's easier for me --

        THE COURT:  In other words, you are saying to the extent that the presentence report talks about the circumstances of the case itself, you intend to talk about why you think some of those facts don't accurately describe the

case?

   MR. COLLELUORI:  Right.

   THE COURT:  Okay.

   Why don't we take up the guideline calculation first.  Procedurally, the first thing that the court has to do is make a determination as to what the accurate guideline range is.  And it's important that that be done.  Of course I recognize that whatever guideline range I determine that under the seminal case of Booker that I am not required to follow that guideline range.  I have to consider factors in 3553 of Title 18.  Procedurally it is an important factor in sentencing and it also must be accurately calculated.

   I take it it's the government's position that initially 2C1.1 is the relevant guideline that we begin with, is that correct?

   MR. SPEKTOR:  That's correct, your Honor.

   THE COURT:  Under 2C1.1 (c)(2), the cross-reference, that I then go to the obstruction of justice guideline and then the obstruction of guideline requires a three-level enhancement for substantial interference with the administration of justice is how you get to your guideline range.

   MR. SPEKTOR:  Yes, your Honor.

   THE COURT:  What part of that do you contest, counsel?

MR. COLLELUORI:  It started I believe with the
obstruction of justice, your Honor.  And this is extremely
important.  Outside Mr. Scarpa generally, the government's
position here goes to the heart of the defense function.  A
defense is not our defense, a defense attorney's defense, it's
a defense of the client.  In this particular case the People,
as they say in the state court --

THE COURT:  It's the government here.  We might as
well stick with that.

MR. COLLELUORI:  The government in the Ross case had
information it didn't share with the defendant or defense
counsel, that being the letters that had been transmitted
between Mr. Cherry and Mr. Ross.  Under what was then New
York's antiquated discovery statute they felt they didn't have
to turn them over.  When they did finally turn them over they
then claimed Mr. Scarpa switched gears, which I don't know
what else he would have done.  He still represented the
client.  They said he switched gears to protect himself.  You
still have to win your case.  At that point when he realized
that Mr. Cherry was way off and his client had misled him that
he then switched gears.

Getting back to the original issue about whether or
not Cherry has to be called or not I don't believe that's
really his call.  I don't believe he obstructed justice in any
way shape or form.  At the end of the day Cherry was already

the witness for Ross before Mr. Scarpa got in the case.

THE COURT:  Can I clarify one thing?  Mr. Cherry was not an a witness in the prosecution's case, correct?  He was called by the defense.

MR. COLLELUORI:  That's correct.  Originally Cherry was a prosecution witness.  I believe he testified in the grand jury.  I could be wrong about that.  I believe he testified in the grand jury.  He then had a falling out --

THE COURT:  In any event, in the context of this trial it was the defense that Cherry --

MR. COLLELUORI:  And it had no case.  He was between a rock and a hard place.  You cannot get up and say to the jury that Cherry should have been called.  The response to that, if Cherry should have been called he should have called by you.  You can't say Cherry is a missing witness and when he calls him, he doesn't have a choice not to.  The client has told him I want Cherry called.  Cherry has written three letters, I think two to the court, three letters to the court, stating that Bianca Villa has misrepresented and that Mr. Ross is innocent.  These letters are given to Mr. Scarpa by the judge in the case before Mr. Scarpa -- at the time Mr. Scarpa enters the case.  So Cherry has already come out and said he didn't do this by myself.  I grant you Cherry changes things every single time he testifies.  That is every time he writes anything.  That is not necessarily -- that doesn't necessarily

tell anybody he's lying.

THE COURT: I'm not sure this is the time to retry the case.

MR. COLLELUORI: I'm not trying to retry the case. What I am saying to the court I don't see that Mr. Scarpa had any other opportunities, not obstruction of justice to call a witness that the client wants called. He was going to be called no matter what happened. He had to be called. There was no way for Mr. Scarpa to make a defense without somehow having Cherry in. The answer was either call Cherry or put him into the case and say the prosecution failed to call him. He couldn't do the first. He had to call him. What does he do with Cherry once he on the stand? You can't call a witness to testify and lie except if there's a trial strategy that the witness is in fact lying and lies all the time and lies to the client. You can then do that to show the jury.

Now, at some point -- and I don't know this came out in the trial of Mr. Scarpa, but I do know it happened -- Mr. Scarpa and Judge Condon meet and Condon says to him, you're calling Cherry, are you crazy? He goes what choice do I have? If I don't call him, the client is going to appeal this case based on my failure to provide a defense and you're going to wind up having an ineffective assistance of counsel which is exactly as an appellate attorney what I would have done. I would have charged an ineffective assistance of

counsel and there was a witness and the witness claims in
three letters, prior to ever meeting TA, that Ross is not
involved.  Assuming arguendo that Cherry is lying about
different things, it doesn't mean he is necessarily lying
about Ross.  Mr. Scarpa is not at the scene of the crime,
doesn't know whether Cherry is lying before per se or not.
During entire trial it never comes out that he and Cherry ever
together conspired, if you will, to put anything misleading
before the court.  It's not until Bianca Villa shares the
letters that Mr. Scarpa is aware that everything was set up by
his client through Mr. Cherry.

THE COURT:  You are arguing that Mr. Scarpa is not
guilty?

MR. COLLELUORI:  No I'm not.

THE COURT:  You're saying there's no obstruction of
justice because in your view he didn't do this.  He was acting
as any criminal defense lawyer would have acted.  The jury
rejected that.  That was an argument his defense counsel
made -- the jury rejected that -- in which he says the guy
will do anything he asks him to do.  The jury rejected that
inference and found the defendant guilty.  I don't know why
we're arguing that he's not guilty at this stage of the
proceedings.

MR. COLLELUORI:  The jury found him guilty of the
travel act.  Even if they found him guilty of bribing the

witness to say certain things it doesn't mean that he doesn't get to call the witness. The witness still has a value and that value is not belonging to Mr. Scarpa. It belongs to Mr. Ross. So Ross can in fact appeal saying, look, Mr. Scarpa didn't effectively represent me because he didn't call the one witness who said I didn't do it.

Now, maybe he was lying about whether I did it on Friday or Thursday or maybe he was lying about where he got the gun or maybe he was lying about how it got in my car or how the lipstick got there, he's not lying about me not being there. You still have to call the guy. In this particular case there was no jury. There was only Judge Condon. I think that if the government now had an IAC claim in front of it, ineffective assistance claim, it would be arguing this is trial strategy and it's allowable. That's exactly what's going to happen if an IAC is filed by the appellate attorney. That's exactly what the court is going to argue. That was his trial strategy. It can't be both. The reality of this is you have to call the witness. How do you get the information in from the witness saying he didn't do it if you don't call him, if you know you are going to get a missing witness charge because he is just as available to you as he is to them.

THE COURT: You can always make a missing witness claim. Lawyers argue every day in front of me the government has the burden of proof. We have no burden of proof.

MR. COLLELUORI:  Right.

THE COURT:  Where is this witness?  The government didn't call him.  He had options other than calling the witness.

MR. COLLELUORI:  The government gets up right afterwards:  Wait.  He was just as available to Mr. Scarpa as to us and what's worse is there's not a jury in this case.  So the judge knows that he's just as available to Mr. Scarpa as he is to the prosecution.  Maybe you can pull the wool over the eyes of a group of jurors with that argument.  You're not going to pull the wool over the eyes of a former district attorney who is now a judge.  There was no way to do this.  I have looked at this thing from six ways to Sunday.  There's no way to get the information before the court and preserve it for purposes of the appeal, etcetera, etcetera, without calling the witness.

THE COURT:  Here is the problem that you don't appear to understand:  If the government had called Cherry as the witness to say affirmatively that Ross had been guilty of the crime, they would -- Mr. Scarpa would have been able to use this impeachment material to show that Cherry was not someone who could be believed.  That is a world of difference between doing that, calling him in a case.  The impeachment material is besides the point.  At this point he's offering this witness for affirmative evidence that Ross didn't have

anything to do with it at that point in time. He's calling him as an affirmative witness to that fact. There is evidence which suggests strongly that the witness was -- by Gallman, giving rise to say this affirmatively at that point in time and that the defendant was aware of the fact that he was offering perjured testimony. If this isn't clear to counsel representing Mr. Scarpa, I'm very concerned about that.

MR. COLLELUORI: You should be, your Honor. I looked and listened to every one of those tapes and in not one tape did Mr. Scarpa or Mr. Gallman say that they told Cherry to lie about whether or not Ross did this. You know, I'm in a particularly good position in this case to know the truth because I know every single one of these players. Mr. Scarpa and I were on trial together just prior.

THE COURT: Maybe, counsel, you should have been a witness at the trial on his behalf.

MR. COLLELUORI: I should have tried the case. I was too ill and I apologize to the court.

THE COURT: He was well represented.

MR. COLLELUORI: I'm not saying he was not. Still I feel guilty for not doing that. I understand the court's point. I get the court's point. But there is nothing here that says that Scarpa or Gallman told him to lie about whether Cherry was the witness. There is an innuendo in the government's submission to the court that says, well,

Mr. Scarpa met twice with him. He must have sculpted his testimony at that point in time. Must have? That's just an assumption that the government wants to make. I understand the court's decision on the Rule 29. I disagree with it vehemently. But I understand. The point of the matter is I don't have to reargue the underlying case. There is a telephone call from Mr. Gallman to Mr. Scarpa saying that Cherry will say whatever he wants us to say and that we will -- that he wants certain things for that. I got that. That's guilty. It doesn't say he will get on and exonerate the client. Now, there's another reading of that completely which is how I took it when I first heard it, which is that Cherry, who is now in a maximum security prison, in a fairly decent place, is willing to leave that prison, come down for two to three weeks to sit in Suffolk County jail, which is not as nice, is willing to take the chance that his spot at the prison that he is at will be taken by somebody else, is willing to lose all of his personal things, but he is willing to come in and testify. That's how I took it when I heard you say it. I could understand the other view of it. At that point there is still nothing there that says he will come in and exonerate the client. There never is in this case one time. When this case goes to appeal --

THE COURT: By the way that's what he did, he came in and testified and exonerated the client. That happens to

be the fact of what.

MR. COLLELUORI: This is what Cherry said he was going to do in the three letters to Gallman. That's the one thing he was consistent about every single time. How does Scarpa know what he's lying and not lying about? The court is making a huge jump.

THE COURT: You're still arguing the Rule 29 to me.

MR. COLLELUORI: No I am not.

THE COURT: Yes, you are. You are arguing that the defendant is not guilty. We're beyond that.

MR. COLLELUORI: I'm not arguing that. I'm saying he could be guilty of having the client bribed to say things. We don't know what it is from the tapes or anything else that the defendant or Cherry was asked to lie about and without that knowledge it's unfair to assume he was asked to lie to say that he exonerated Ross, especially since he was saying that prior to ever seeing Gallman, these three letters to judge -- not Judge Condon but the previous judge, Judge Hudson, three letters to Judge Hudson said this guy didn't do it. He has issues in those letters that tell you he's a lousy witness and then if you want to take the jury's verdict and say, well he was bribed, okay, what was he bribed about? That's the issue. And I'm sorry I don't think the court can make the stand and say the jury found them to be bribed about lying --

THE COURT: Excuse me. If he's bribed about anything then that constitutes, in return for whatever testimony he's given, that constitutes obstructing justice, which takes us to the obstruction of justice guideline.

MR. COLLELUORI: It doesn't do that, your Honor. If he is going to be called no matter what happens, it's not obstruction of justice. He's going to testify. Look, if Scarpa got sick that morning and said, Tony, will you come in and try the case, and I walked in there that day and I put this guy on the stand without knowing anything about TA, not knowing anything about Bianca Villa's letters, only knowing about the letters from Judge Hudson or to Judge Hudson, that's all I know and I call this guy it's not obstruction of justice. I would have called him anyway. Even if the client says to me he's lying about how the lipstick got there. Maybe I cross him about that or as a hostile witness. I have three letters saying this guy didn't do it. That's the only thing the guy is consistent about. I don't see how you can obstruct justice if you don't know he's lying about that.

THE COURT: You don't know he's lying about that?

MR. COLLELUORI: The jury found he was lying. They didn't find he was lying about exoneration and that's extremely important. That's the obstruction of justice.

THE COURT: I think we're operating in a different universe. I don't understand. The argument is just

incomprehensible to me in light of the jury's verdict.  So I
find that 2C1.1(c)(2) says that the offense was committed for
the purpose of concealing or obstructing justice in respect to
another criminal offense, then you apply the obstruction of
justice guideline.  Clearly this offense was committed for the
purposes of concealing or obstructing justice with respect the
murder trial of Mr. Ross.  So if you then go to the
obstruction of justice guideline, which is 2J1.2, the base
level is 15 and the Probation Department agrees with the
government that 2J1.2(b)(1)2 applies if the offense resulted
in substantial interference with the administration of
justice, increase it by three levels.  In order to know
whether that applies we have to go to the definition of
substantial interference with the administration of justice.
And the portion of the definition that the government relies
on is the unnecessary expenditure of substantial governmental
or court resources.  As I understand it, in part, what the
government relies upon to prove that aspect is the fact that
Cherry had to be brought down at expense to the government to
testify on I guess it was two different days.  Is that
correct?

          MR. SPEKTOR:  I think it was four days, judge.

          THE COURT:  And also I'm told that two rebuttal
witnesses had to be called to meet his testimony.

          MR. SPEKTOR:  That's correct.

Anthony M. Mancuso, CSR    Official Court Reporter

THE COURT:  Counsel, do you have anything that you want to add to why you believe that doesn't constitute unnecessary expense of governmental or court resources?

MR. COLLELUORI:  It's the same argument as one I just made.  If he was going to be called no matter what and he was going to be called no matter what, if John had said I'm not going to do it and then the defendant says, well, I'm going to be my own attorney and call him, he still has to come down.  All right.  So it's the responsibility of the government to provide him.

As far as the two rebuttal witnesses are concerned, the government because it had the letters could have, if they just told Mr. Scarpa early on that they had the letters, would have avoided having to call two rebuttal witnesses.  It would have been part of the case or Cherry would not have been part of the case.

THE COURT:  I'm not sure I follow that.

MR. COLLELUORI:  They could have introduced the letters.  Along the lines of attempting to obstruct justice, basically, Ross was doing that with his witness and trying to tempt that witness to lie.  If they introduced it as part of the case, it would have been part of the evidence proving that he was guilty, consciousness of guilt.

THE COURT:  They didn't do that.

MR. COLLELUORI:  No.  They didn't tell Mr. Scarpa

they had the letters.

THE COURT:  When did Mr. Scarpa learn about the letters?

MR. COLLELUORI:  Mr. Scarpa learns about the letters from Ross to Cherry after he's called Cherry and he's testified.  That's my understanding.

MR. SPEKTOR:  That's not true.  We had testimony in the trial from ADA Bianca Villa that those letters were turned over before trial.

MR. COLLELUORI:  Yes, in a dump.  Yes.  There may have been an evidence dump, that is correct.  They were not pointed out to Mr. Scarpa.  You're telling me that these letters would exist and an experienced defense attorney would have called this witness to do this anyway, if he had seen the letters.  One, I don't believe -- Bianca Villa may have testified he gave it over.  I don't believe that's the case. The first time it comes up in the case is in the conference midway through the testimony with Judge Condon and that's the first time it comes up that we know that Mr. Scarpa knows about the letters, about Bianca Villa says he turned it over. I now have Bianca Villa.  I know he didn't turn it over.

THE COURT:  That's an incredibly inappropriate argument here today.

MR. COLLELUORI:  I'll withdraw that.

I know in very many cases Rosario material, which is

what we call it, occasionally does not find its way to defense
counsel, not necessarily on purpose, but because somebody
doesn't put it in one pile or puts it in another one.

THE COURT:  I don't have testimony before me that
contradicts the testimony of Bianca Villa on this point and
you can't testify to this.  I'm not sure what we are doing
here.

MR. COLLELUORI:  Mr. Scarpa's position is the first
time it comes up, the first time he's aware of it is during
that conference.

THE COURT:  There's no testimony to that effect.

In any event, let me hear the government as to
why -- in response to this -- as to why this particular
substantial interference with the administration of justice is
an enhancement that the court should impose.

MR. SPEKTOR:  We have outlined all of the ways that
the resources were wasted in this case, judicial,
prosecutorial and investigative.  We have outlined them on
page 18 of our submission.  I think the very short of it is
this trial became a mockery of what it should have been
because Mr. Scarpa decided to bribe a witness and bring Cherry
into this case who literally laughed as he perjured himself.
As a result the state had to scramble to come up with rebuttal
witnesses and investigate the visit that Gallman made to the
witness.  I think we are well within the range of conduct that

the Second Circuit has held to constitute substantial
interference with the administration of justice.  One
clarification, the base offense level is 14, not 15.

       THE COURT:  I said 14.

       MR. COLLELUORI:  You said fifteen, your Honor.

       THE COURT:  I'm sorry.  If I did, I misspoke.  It is
14.

       MR. SPEKTOR:  And the testimony that ADA Bianca
Villa gave during our trial here about turning over those
letters well before the trial is on page 66 of the trial
transcript.

       MR. COLLELUORI:  If I can just a moment, your Honor.

       THE COURT:  Sure.  Something you said early on got
into the 14th or 15th thing.

       MR. COLLELUORI:  To say that they had to scramble is
just unbelievable.  Bianca Villa knew that he had the Ross
letters.  He had already done all the investigation to that
extent.  Again I think Judge Condon if the defendant insisted
on having him -- Cherry testify, Judge Condon would have
ordered that he be allowed to testify.  Judge Condon and
Mr. Scarpa had that conversation.

       THE COURT:  Judge Condon and Mr. Scarpa had what
conversation?

       MR. COLLELUORI:  Judge Condon, Mr. Scarpa and Bianca
Villa had a conversation during the course of the trial --

THE COURT: Is this part of the record?

MR. SPEKTOR: It's not, your Honor. I want to add one thing because counsel continues to testify about things that are not in the record. If he wishes to be a witness for Mr. Scarpa, then I think Mr. Scarpa has to waive his right to a conflict.

MR. COLLELUORI: I would be open to doing a Fatico hearing on this issue.

MR. SPEKTOR: You couldn't be an attorney then. Mr. Scarpa would have to waive any conflicts.

MR. COLLELUORI: I didn't say I will testify. If you called Judge Condon, he will. If you want to have a Fatico hearing I'm more than willing to do that.

THE COURT: About what?

MR. COLLELUORI: Whether or not Mr. Scarpa had the conversation with Condon that he had to call Cherry because the defendant was requiring it. This defendant is in charge of this case. It's his case. He's calling Cherry.

THE COURT: I want to get this straight right now to make sure that I understand your position: Is it your position as a lawyer admitted to practice in New York and a member of the New York State Bar and a member of this court that if your client tells you to put a witness on the stand and to bribe that witness to perjure himself that that's something you can do because your client told you to do it?

Is that your position?

MR. COLLELUORI:  No, your Honor.

THE COURT:  That's what this adds up to.

MR. COLLELUORI:  No.  You put in a couple of extra facts.  For starters you are saying that Mr. Ross ordered his attorney to bribe.

THE COURT:  All right.  Assuming the defendant does -- the attorney does it on his own, taking Mr. Ross out of it, are you saying that an attorney knowingly suborns perjury from a witness by offering a bribe and that is in his client's interest he must do it because he has to represent his client effectively?  Is that the argument you are making to this court?

MR. COLLELUORI:  What I am saying to the court is really two things.  One, this is not the regular bribe.  This is not a regular bribe where money is offered for you to do this.  This is a very, very tangential benefit.

THE COURT:  It doesn't make a difference what kind of bribe it is.  A bribe is defined as the offering of any type of benefit.  It doesn't have to be a good bribe.  Any bribe will do.

MR. COLLELUORI:  I don't agree because I don't believe it's a benefit.  That's beside the point.  The jury did think it was a benefit.  So the jury found a benefit.

You cannot even prove in this particular case that

Mr. Scarpa put him on the stand and he testified about what he alleged was bribed for. You can't even prove that because it's not in the tapes.

THE COURT: In the tapes it refers to the fact he'll say anything we want him to say.

MR. COLLELUORI: About what? As I pointed out to the court when I first heard that, after 35 years of practicing before the court, after 35 years of practicing mostly in the state courts --

THE COURT: I think -- never mind.

MR. COLLELUORI: That comment has a much different meaning to me than played out in the trial. I didn't testify. I was not asked. But that is a linguistic crime. Even if that's the case, I'm accepting that that was done. But I don't know what he was bribed to say and not to say. Neither does anybody else. So, therefore, at that point in time --

THE COURT: One could infer it would be what he said.

MR. COLLELUORI: You can infer anything, but that's not fair.

THE COURT: That's what the jury inferred. Excuse me, counsel. I don't think that this is very productive. I don't think we're making much headway here by your repeating an argument that I find completely not appropriate, if not distasteful. I think that we should move on.

MR. COLLELUORI: Okay.

THE COURT: In my view, having heard the evidence, I believe that the government has demonstrated here the application of this enhancement for substantial interference with the administration of justice -- I think that monies expended bringing Cherry to trial, back and forth, was an unnecessary expenditure. You make the argument -- and I understand it -- that any defense lawyer would have called Cherry. But in this case he was called -- in this court's view and what the jury found in my view -- for the purpose of offering false testimony. There was no other reason for him to be there. He had nothing affirmatively to add to the case unless he were to say that Mr. Ross was not involved.

I also think that even if you don't count bringing Cherry in, there was also unnecessary expenditures based on the fact that they had to call rebuttal witnesses to meet the testimony that Cherry offered.

The one thing I will correct the record about is you are correct that there was no evidence that said Ross told Mr. Scarpa to have Cherry do one thing or the other. There was no evidence of Ross per se telling Mr. Scarpa to do anything. To the extent that I said that, I misspoke.

So I find that the guideline range here is accurately calculated in the addendum. It's a total offense level of 19. The guideline range of 30 to 37 months is the

appropriate guideline range in this case.

I have lengthy submissions, both on behalf of the defendant and the government on what the appropriate sentence should be. But I'm certainly prepared to hear counsel further on that issue and of course to hear Mr. Scarpa on that issue.

Is there anything that you would like to further comment on that -- I think the letters are pretty exhaustive about that. Obviously, if you would like to say more on Mr. Scarpa's behalf I'm certainly willing to hear it and of course willing to hear in Mr. Scarpa himself.

MR. COLLELUORI: I would, your Honor.

THE COURT: Okay.

MR. COLLELUORI: This is the part of the sentencing that I was looking forward to because I do believe that this is an aberrant situation. I am aware of what the government said about Judge Tiscione's decision and about how they feel that's a violation.

THE COURT: Is that the one where he came and asked the judge -- is that the one you are referring to that he came and asked --

MR. COLLELUORI: To withdraw the bail.

THE COURT: I'm sorry. You are talking about the pretrial services issue. There were two different matters about judges.

MR. COLLELUORI: I'm sorry. You mean Judge Holder?

THE COURT: Yes. I thought that's who you were talking about.

MR. COLLELUORI: We can start there.

THE COURT: You don't need to start there. Keep your train of thought.

MR. COLLELUORI: Thank you, your Honor.

Practicing law in the state courts, in misdemeanor courts and lower felony courts is much different than practicing law here.

THE COURT: Are their ethics rules different?

MR. COLLELUORI: For example, one rule that is different is a lawyer can in New York State speak to a witness about taking the fifth amendment. And Judge Tiscione --

THE COURT: A witness you don't represent, when you represent the defendant and that witness is the victim?

MR. COLLELUORI: Yes.

MR. COLLELUORI: So that's a big difference. Understand the background behind that for a second.

THE COURT: In New York State if I am representing a defendant, according to you, the ethical rules permit me to go to the primary witness against that defendant and suggest, when I don't represent this witness, that I think that witness ought to take the fifth amendment.

MR. COLLELUORI: That is not what happened here. What happened here is the victim came to counsel and said I

lied. What's going to happen to me? And he said, well, if you get on the stand and you change your testimony, you could be charged with perjury.

So, how do I get out of that? You take the fifth amendment. I'm going to send you to an attorney to have him counsel you on that and that's what Mr. Scarpa ethically does. Now, we are a few days before trial and the witness is on the phone. We'll talk about that in a second. Also understand something, this is a witness that Mr. Scarpa had represented years before, doesn't present a conflict, and it's a witness --

THE COURT: Why is it not a conflict?

MR. COLLELUORI: Because the previous representation doesn't affect this client, doesn't affect any kind of privacy rights that would affect this witness. Even without that, he has told the witness to go and see another attorney.

At this point the witness does that. Now, Mr. Scarpa is telling the witness this is how you do what you already have been told you are going to do by your other attorney. There is not a witness who comes and says, hey, help me out here. Tell them I didn't do it. This is a witness who comes to him and says I'm so sorry, I was angry at him for going out with another girl and so I did this.

THE COURT: Is that all in the record?

MR. COLLELUORI: No. There's no record on this

stuff.  It's just the conversation.  Again, if you need the Fatico we can bring the witnesses in.  There is a letter you have received I believe from the victim's mother and the victim to say what happened there.  She's here in the courtroom supporting Mr. Scarpa today.  And that he did his best to protect his client and her daughter.

THE COURT:  I'm sorry.  The victim -- I'm not pointing out anybody in the audience, please.  Is the victim's letter among the character letters?

MR. COLLELUORI:  I noted the mother's letter is there.  I'm not sure if the victim's letter is there or note.

THE DEFENDANT:  Serena Holmes is the name.

THE COURT:  Is it one of the recent letters or the one that was attached to your papers?

MR. COLLELUORI:  It was in the submission, your Honor.

THE COURT:  Where is it?

MR. COLLELUORI:  The initial submission. Mr. Kenniff is more familiar with the paperwork.  I'm somewhat technologically hampered.

THE COURT:  Does the government know where this is?

MR. SPEKTOR:  I'm sorry, your Honor.

THE COURT:  Does the government happen to know where this is?

MR. SPEKTOR:  I don't.  I'm looking myself.

(Pause.)

THE COURT:  Where is it?

MR. COLLELUORI:  It was --

MR. KENNIFF:  Handwritten letter, after a letter
from Steven Mooney.

THE COURT:  Is it at the end of this submission?

MR. KENNIFF:  Roughly the middle or a third of the
way in.

(Pause.)

THE COURT:  I don't see it in my papers.

MR. COLLELUORI:  The whole letter is not there.
It's just a letter from --

THE COURT:  Which letter is not there?

MR. COLLELUORI:  The Holmes letter is not there.

MR. SPEKTOR:  The victim's letter.

MR. COLLELUORI:  But Ms. Walston's letter is there.

THE COURT:  Does the government have it?

MR. SPEKTOR:  I want to confirm.  Is this the
letter?

MR. COLLELUORI:  Yes.

THE COURT:  Can you slow it to me?

MR. COLLELUORI:  You can have this copy.

THE COURT:  The government will give me their copy.
Maybe the government could look in here and see.  I don't know
what letter is being referred to.

MR. COLLELUORI: It's a handwritten letter, your Honor.

(Pause.)

THE COURT: She talks about the fact that -- first of all, the victim's letter is not here. Where would I have had any reason looking at this letter to know that she was the mother of the victim?

MR. COLLELUORI: She's the mother of Mr. Walston.

THE COURT: Wait a minute. Didn't you say a moment ago that both the mother of the victim and the victim wrote me letters telling me that this was not as it had been portrayed to Judge Tiscione?

MR. COLLELUORI: I'm sorry if I said the victim's mother. It was the mother of we call him Tutti, the mother of the boy, and I believe that Ms. Homes also sent in a letter.

THE COURT: I don't have a letter from either the victim or Ms. Holmes. That's what you represented. Ms. Holmes or her mother. I don't have any letter from either one of them. You began this by saying I shouldn't read anything that Judge Tiscione found, because among other things I have a letter from the mother of the victim and the victim suggesting there was nothing to the incident.

MR. COLLELUORI: What I can tell the court -- what I can tell the court is that the victim's mother -- the defendant's mother is in the courtroom. These two young

people, the alleged victim and her son, were
boyfriend/girlfriend from a very young age.  They are not that
old now.  And, again, the victim came to Mr. Scarpa, who then
sent letter to a separate attorney.  That attorney heard what
the victim had to say and counseled the victim to take the
fifth amendment.  Mr. Scarpa is not counseling her to take the
fifth amendment.  He's counseling her on how.  He's saying you
can't say the fifth amendment when they ask you your name.
You have to give your name.  If they ask you a question
concerning Tutti, that's when you say I'm going to take the
fifth amendment.  There's nothing incorrect in the information
he gave her or unethical about the information he gave her.
It's no different than preparing any other witness you put on
the stand.  As I said, in addition to that, there's a
long-standing relationship between them where he's talked to
her.

          Now, as far as the aiding and abetting, again it's
the same situation.  He doesn't make the call.  He doesn't
tell the client to make the call.  In fact, on the tape he's
fairly clear he's shocked that the victim is on the phone with
him, with Tutti.  But this happens all the time in Queens
County and Nassau County.

          THE COURT:  What happens all the time?

          MR. COLLELUORI:  Where the victim doesn't want or
doesn't know of her order of protection and the two of them

work out their own situation and defense counsel is not even
aware of it.  But at that point it is a fait accompli.  Judge
Tiscione suggests he should hang up.  That's all well and good
except for the fact that it is very difficult.  Rikers Island
for a defendant --

        THE COURT:  By the way the defendant was also on the
phone and there was an order of protection extant.

        MR. COLLELUORI:  The two of them, not Mr. Scarpa,
the two of them violated on their own.

        THE COURT:  I thought it was set up and Mr. Scarpa
knew he was on the phone.

        MR. COLLELUORI:  No.  Originally, he says he's
surprised that the victim is on the phone.  He then asks him
are you calling me on your number?  He says yes and he tells
him to call him back.

        Now, the victim -- the defendant then uses somebody
else's number to call him back.  I don't know why that
happened.

        THE COURT:  Why does he want it done that way?

        MR. COLLELUORI:  He doesn't want the victim on the
phone.

        THE COURT:  Why does he want the defendant to call
him back?

        MR. COLLELUORI:  Because he wants to tell the
defendant not to participate and don't do this.

Unfortunately, the defendant then does the same thing he did the first time and puts her on the phone.

MR. SPEKTOR: I'm sorry. There's a factual misrepresentation. Mr. Scarpa doesn't know that the victim is on the phone the first time the defendant calls.

MR. COLLELUORI: Right.

MR. SPEKTOR: Then he says he would appreciate it if the defendant called from a different inmate number.

MR. COLLELUORI: Does he say inmate number?

MR. SPEKTOR: The defendant asks do you want me to call you back. I can give you the right quote. And Mr. Scarpa says I would appreciate it. The reason he's doing that is to avoid monitoring.

MR. COLLELUORI: The reason he's doing this -- we all know, if we assume that I had this fourth grade teacher told me when you assume you're making an ass of you and me. It's not a time to assume anything. There's no statement. He says call me back. There's no statement that he says call me back on somebody else's line. There's no statement that says call me back with the girl. Just call me back.

MR. SPEKTOR: It is the second call when Mr. Scarpa understands there's a victim on the line.

MR. COLLELUORI: Right.

MR. SPEKTOR: You said it was something different.

MR. COLLELUORI: I believe it's the second thing he

says in the first call and he says yeah.

    MR. SPEKTOR:  The --

    THE COURT:  I'm sorry.  You can't be talking back and forth to each other.  The court reporter can't get it.  If the government would state their understanding and then whatever counsel wants to say he can.

    MR. SPEKTOR:  Sure, your Honor.

    One correction.  Counsel suggested that in the first call Mr. Scarpa's realized there's a victim on the line and that is why he wants the defendant to call back hoping that this time the victim was not going to be on line any more. What's wrong with that argument it's only on the second call that Mr. Scarpa realized the victim is on the line.

    MR. COLLELUORI:  So it would make the victim call him back on a different line using somebody else's number.  I don't understand that.  If Mr. Scarpa is aware that the victim -- he's not aware that the victim is on the line in the first call and is surprised that she's on the line in the second call, why would he ask the defendant to call him on another line?  It makes no sense.  He wanted him to call him back because obviously, as I understand it, Mr. Scarpa is in the car at that time.  He's in the middle of traffic.  It's an inconvenient time to speak.  He needs to pull over.  Now, he pulls over and they are talking on the phone.

    MR. SPEKTOR:  Judge, the quote I'm looking for, this

is Exhibit B in our sentencing submission. There is the first call, Mr. Scarpa says I do have a question for you. Are you calling on your own account? The defendant says, yeah. I ain't talking to you. Mr. Scarpa, all right, okay, no problem. The defendant says see you tomorrow or if you need me to call you, I'll call you back. I can call you back. Do you need me to call you back? Mr. Scarpa says yes, I would. There's no need to call from a different inmate account other than to avoid monitoring.

MR. COLLELUORI: Why would Mr. Scarpa want to avoid monitoring given the fact that the DA's office swears on stack of bibles that it doesn't listen to inmate phone calls. They have a different bureau that listens and screens out these things. That's not the case. Why would he do that? That's another thing, his phone is registered.

MR. SPEKTOR: The first call is registered to the defendant.

MR. COLLELUORI: My client's phone is registered.

THE COURT: Don't go back and forth between each other, please.

MR. COLLELUORI: What that means is my client's phone is registered. If, in fact, they wanted to see he was receiving phone calls from the jail they could check his phone rather than making the calls. They are not supposed to record calls to counsel.

THE COURT:  All right.

MR. COLLELUORI:  If I may continue?

I don't believe that that phone call, either one of them, was an attempt to obstruct or commit a crime.  It's the flotsam and jetsam of a regular day that any state attorney gets in his car in the middle of the night.  It was a short thing.  I don't know why Mr. Scarpa would have a feeling of nervousness with it.  Again, his phone calls are not supposed to be recorded or listened to.  I don't know why anybody would -- why this defendant would think, use somebody else's number as well.  That doesn't matter either.  In fact, if anything, Mr. Scarpa's first comment is are you using your number, to make sure he's not messing around.  That's just a fair assumption as counsel's assumption.

Anyway I have to deal with these two things, because unfortunately they were brought up by the government.

The other portion is dealing with his honor, Mr. Holder.  I took the liberty of looking at The Robing Room last night.  The Robing Room is a website that rates judges. The ratings there are usually anonymous and usually by attorneys.  Judge Holder has one of the lowest if not the lowest rating in the Borough of Queens.  In the comments section of robing room, it mentions that he holds grudges, that he has settled scores.

THE COURT:  I think we would be better off not

wasting time or wasting the record based on such unimpeachable
sources and I say that with all the dripping sarcasm I can
about comments about The Robing Room.  What are we talking
about?

         MR. COLLELUORI:  This is not relevant conduct.  It
doesn't belong in their letter.

         THE COURT:  That's an argument that I am entitled --
I'm perfectly happy to hear, that there's no significance to
these comments.  That's fine.  Now we are doing character
assassination on a judge, talking about The Robing Room.  I am
not sure where I am today.  It's becoming increasingly
problematic.

         MR. COLLELUORI:  Let's make that argument.  It's not
relevant to the case involved herein.  I'll leave it at that.
I can't find any cases to say it is.

         THE COURT:  It was not alleged to be relevant
conduct.  The government was making the point in response to a
claim that Mr. Scarpa had had this spotless record, you know,
before the court, that this is the first time he's done
anything that anyone would even describe as remotely untoward
and they just made that argument in response to that claim.
They are not claiming it's per se relevant conduct or another
criminal act.  They are just saying that they are offering
this contradiction to the claim that Mr. Scarpa has led a
spotless professional life up until the point of this trial.

That's what it was offered for.

Am I mistaken about that?

MR. SPEKTOR: That's right, your Honor. That's correct.

THE COURT: In any event, I don't see that it has much weight to the sentence that should be imposed here. So I don't know that we need to spend time on it, particularly if we are going to discuss The Robing Room.

MR. COLLELUORI: Okay. Like I said, now is the part where I get to do what I want to do, which is to tell you about John Scarpa.

THE COURT: I'm sorry that it has taken this long. I'm glad that we're now at that point. Let me hear you.

MR. COLLELUORI: I have known John since I'm ten years old. John was 16. And the John Scarpa I know is not described in this trial at all. There are about 30 people in the courtroom here. They have known John Scarpa, if not well, better than I. They would tell you the same thing. As a young man growing up John went to law school before I did. He was a model to me. He went to Saint John's. I wanted to go to Saint John's but wound up at Hofstra and when I went to the DA's office I applied to the DA's office to work. I didn't live in the county where he was given a job. So I took the job at Legal Aid and all the time that I was at Legal Aid and John was in the DA's office we would discuss our cases and he

would give me clues as to how you get certain evidence before the court, how to subpoena witnesses, where to file things.

THE COURT:  I'm sorry.  There must be a mistake in the defense counsel's letter.  You said he went to Saint John's and in the letter on page two he says he went to Quinnipiac.

MR. COLLELUORI:  He went to Quinnipiac Law School.

THE COURT:  That's not Saint John's.

MR. COLLELUORI:  No, Quinnipiac.

THE COURT:  How well do you know Mr. Scarpa?  You don't know where he went to law school.

MR. COLLELUORI:  I know where he went to law school, your Honor.  I know Mr. Scarpa since I'm ten.  Our families were very close as almost everybody in this courtroom can tell you.

This case has had a tremendous effect on everybody who knows Mr. Scarpa, as a matter of fact, including me.  It's had a tremendous effect on him, himself.  He'll address that himself later.  I have never seen anybody who has done as much as Mr. Scarpa has done to help others.  From day he opened his practice Mr. Scarpa took every single DA case, veteran's case pro bono.  Mr. Scarpa put time in working on those cases as any other case he has.  Ms. Walston talked about her son Tutti.  Tutti's father was a homicide victim that Mr. Scarpa represented -- No.  He met and he took that child under his

wing. And he provided a fatherly advice to the child. TA, that was a reclamation project.

THE COURT: You're talking about Mr. Gallman?

MR. COLLELUORI: Yes, I am. Everybody new that John was trying to help Mr. Gallman change his life. It didn't happen and in fact John was a victim of Mr. Gallman's. He had money stolen from him. But John tried anyway. John is a very religious man who I think tries to do the lord's work. I can tell you that we have fifteen families that are in a welfare motel in Nassau County. The children do not get a hot meal if they are not in school. When John found out about that he came to plea and told me and our Lion's Club raised enough money so those children now get fed twice a week. John helped lead that effort. Because of his conviction John can't be part of the Lion's Club any more and he has resigned without being asked.

Similarly, he has such respect for the law and for the bar that upon conviction before being asked anything he resigned from the bar.

THE COURT: What do you mean before being asked?

MR. COLLELUORI: Before having an investigation opened.

THE COURT: The case was opened in the Second Department but he didn't oppose it?

MR. COLLELUORI: Right.

THE COURT:  The case was opened?

MR. COLLELUORI:  Yes.  They hadn't had the hearing yet my understanding was.

THE COURT:  It was opened.  He didn't resign before a case was opened?

MR. COLLELUORI:  Yes.  The case is opened but -- what they do is there's an interview.  You have to go down to the interview.  It was before the interview, after they opened the case, he immediately resigned upon conviction, not upon being notified, hey, you have to come in.  Most attorneys don't do that.  Most attorneys wait.

To give you an example of how much the bar respects John there are at least five attorneys in the courtroom besides myself and Mr. Kenniff who will testify to that, including Mr. Murray who is running for District Attorney in the County of Queens on the Republican line.  He's in the courtroom.

They know John to be a good lawyer who has put in every effort he can.  John provides a holistic practice.  He doesn't just handle the case.  He attempts to put the client in a place that he never returns again to the criminal justice system.  There aren't a lot of attorneys who do that.  John takes money out of his own pocket -- and I have seen him do it -- because he can see that one of his clients doesn't have enough money for lunch, doesn't have enough money for the bus

to get to court. Legal Aid does that. They get funded by the government for that. John doesn't get funded. He does it on the his own. John and Carey, she's in the courtroom today, she was here during the trial, raised a family and he's the grandfather of at least six now. Each one of his children is more polite, more respectful and a good kid than the next. They raised a phenomenal family and John went out of his way to help with that. He coached a sport he didn't know anything about, soccer. He supported them in every single portion of their life and in addition to that when John wasn't making enough money to do that in the DA's office he humbled himself to drive a delivery truck for I believe it was a pizza place, Pizza Hut, to deliver pizza so that they would be able to have and stay in the house they lived in because there was no raises coming.

John, in addition to all of those things, John taught me a respect for the law. I told the court that just before he tried the Ross case we were on trial together before Judge Lattela in the Jamona case. The Jamona case was to say the least a crazy matter and there were many, many times where we would get red herrings thrown at us and witnesses would come forward from the community and they would want to testify about things that -- they will tell us right in front of us we can just say this. And I could count the amount of times that John would tell them, he would tell them constantly, we don't

lie.  We don't make things up.

And he never taught me a lie.  He never taught me to make things up.  I teach trial techniques at the state bar. I'm a section chief of the state bar's trial advocacy program. I write about this topic and speak on it often.  I would tell the court that 90 percent of the trial techniques that I have I learned from John.  I learned to be a dedicated lawyer from John.  I learned to help others.  Even when he was in the DA's office, he would go out of his way to help the victims he worked with.

There's a Parents of Murdered Children organization in Queens County.  John brought that to the DA's office.  John is the one that helped form it.  John is the one that still to this day is in contact with many of those parents and their families.  He's helped their children find work.  He's helped their children get into school.  He's helped them discipline the children when they got out of hand.  He's been a Dutch uncle to those kids and he's been the strength and backbone and there are a number of letters in the court's filings from the Parents of Murdered Children that talk about the effect John had on them.

It confounds me to think that John would do anything untoward in a murder case because he knows how it affects victims and so, yes, pardon me if I'm skeptical of your decision.  I accept it, I'm a lawyer.  I'm taught to do that.

I find it so difficult to believe.

Nothing is served by putting John Scarpa in jail. There's no deterrence that's going to be served. He's not going to learn a lesson that he has learned. He's lost his vehicles. He's lost his respect. It was all to do that you could get him to go to a program that we had at Lions Club that was in part honoring us for the work that we did on behalf of those children, the hungry children in the motel. He was so ashamed and he didn't want to bring any disrepute to the club.

I cannot tell the court how important this man is to our community, how important he is to his family and how important he is to his church. You know in the courtroom right now there is a bishop, two priests and a higher group of nuns that traveled down from Randolph, New York, 40 miles south of Albany to be here today to help Mr. Scarpa for the things he's done for them and his church.

This is not somebody who is out there as the government would have you think committing crimes every single day and playing fast and loose with the law. This is somebody who a number of us look up to to be ethical. Warren Silverman is in court today. He would testify if the court would let him, having been a colleague in the DA's office and shared office space with him afterward. They have been together longer than anybody except for Carey.

This is so out of character, I believe aberrant is the word we like to use in federal court.  Judges have come up to me, your Honor, and while they have ethical obligations not to necessarily testify, I can tell the court, they ask for him to see how he's doing.  One judge would have been here today, he's a retired judge, he would have come, Judge Erlbaum from the Queens County court, he's not up to it, who John appeared in front of many times.  And even on FaceBook he put down how he felt about John.

I can't explain to this court how out of character -- that's John grandson -- I can't explain to this court how thrown most of the defense bar is and the state defense bar. I can only hope that the court will not take John from his family and from us.  John's ability to do good for our community is so large that the court doesn't even have to order him to do community service because he does community service every single day, but that would be more appropriate.

John Scarpa is a grandfather.  He's 66 years old. He's not a violent man.  He made no money on this case.  In fact, he lost money on the case.  He didn't use money to bribe anybody.  There but for the grace of God go we because I can think of a hundred areas where things like this happen and lawyers step into it, say stupid things on the phone, get caught up in the heat of the battle.

I know that they said every one of the participants

in this case, I think if we're all honest, we can all say we
have had times in our lives where we have done things we are
not proud of.   John's not proud moment is on a stage.   He was
on the front page of Newsday's local section.   He was on News
12 for an entire weekend, on and on, that John Scarpa is a
briber, he's a liar, he's a cheat, on and on and on.   He's
fallen far from the top, your Honor.   He's fallen as far as
one should have to go.   To put him in jail right now is to
negate and to give no credence to the things that he's done
that are positive.   Should he have known better?  Maybe.
Maybe.   But justice is law and mercy put together and mercy
and law in this case call for John to not be taken from the
community.

        I know for a fact John's never committed a different
crime or any other crime to my knowledge.   Again, I think I
speak for all of the people in this courtroom right now to say
that not only do we love him, but we are afraid and we're
begging this court to hear us to not to take our brother away,
that this is one time that justice is served by returning him
to us and allowing him to rehabilitate himself with the years
that he has left.

        I talked to John the other day and I know he's upset
about losing his license as a lawyer.   I decided I wanted to
be a lawyer when I was young.   I know it's hard for him.   I
said to him you're going to be doing all the things you did as

a lawyer without the law part in helping people get on, your
people, and when the sentence is over, I'm hoping the court
doesn't give a long probation sentence either, when the
sentence is over he can rejoin the Lions.  We're going out
there thanks to him.  I know he can help me and help the
others to help so many families and so many people who need
him.

Your Honor, you will never find a man with a bigger
heart than John Scarpa.  I will never know a person who is
more kind and a better set of guidance, even if his guidance
system went off on is this case.  John is a true blue and I
cannot in any way, shape or form give you any further or
better assurance than my own that not only will you never see
his face again, but that no court will ever see his face again
sitting as a defendant.

I don't think I have a lot or anything left to say,
other than as a lawyer, as a member of the bar, as someone who
has appeared before this court before, as a citizen I hope
that you will allow John Scarpa to continue to be amongst us
as quickly as possible and that you will allow him to prove to
you that he's the man I say he is and not the man that's been
portrayed to you.

I have nothing further.  I know that he would like
to speak to you.

THE COURT:  All right.

Before I do hear from Mr. Scarpa because I always
want the defendant to have the last word, let me ask if the
government has anything to say.

MR. SPEKTOR:  When Mr. Scarpa was under a microscope
on pretrial supervision in this case, under federal indictment
and just two weeks after appearing before your Honor, he
committed a crime.  He aided and abetted the violation of a
protective order.  When he thought no one was watching he
bribed a witness in a double homicide trial.

THE COURT:  When you say he aided and abetted
violation of a protection order, how did he do that?  My
understanding of the facts are the defendant called back with
the victim on the phone.  He didn't ask to have the victim on
the phone, did he?

MR. SPEKTOR:  That's right, your Honor.  I'm merely
explaining the finding that Judge Tiscione made.  Mr. Scarpa
expanded the conversation.  He knew there was a violation of
the protective order afoot already because the victim was on
the line with his line who has two orders of protection
against the victim.  He doesn't say you have to hang up.  Stop
the conversation.  He expands this conversation and he advises
the victim of how she should assert her fifth amendment right.
That's the finding Judge Tiscione made.  It was at the very
least grossly unethical.  And Judge Tiscione found it leads to
the commission of one crime.  When Mr. Scarpa bribed the

witness in a double homicide trial, you heard his voice, you heard him, there was no crossing the line. The idea to bribe Cherry may have come from Mr. Gallman. Mr. Scarpa is the one who ran with it. Contrary to what counsel said today, at trial he told the judge, this is at page 1869 of sentencing exhibit A, he said the decision for Mr. Cherry to testify is ultimately mine. Mr. Scarpa crafted his direct examination of Cherry to navigate around all the incriminating evidence and to explain away the prior inconsistent statements. Then he tried to cover his tracks when Gallman's visit was exposed. He lied to the judge and said all he wanted to do with Cherry was to expose him as a liar all along. There was never a hesitation and that's when you heard from the victim, and we talked about the two calls where Mr. Scarpa said I would appreciate it if you would call me back. The defendant calls back from a different inmate account. The first thing Mr. Scarpa says we good now, and then says all right so what is she doing? Never any hesitation.

In the Ross trial you heard how he got Queens gang members to intimidate a witness. He talk directly to them. He says to Mr. Gallman they are on their way. When he examines the witness who is intimidated by these gang members, he asks the witness take a look around the courtroom. The courtroom that is packed with gang members and he asks do you recognize anybody. He even repeats the name of a particular

crew of gang members that's in the courtroom.  Scarpa is the
one that tells Gallman they could make up fake impeachment
information for the cooperator.  As you heard during the
trial, he tells Gallman, all I need to know is anybody who has
been shot in Queens.  That will give you a good-faith basis to
cross-examine that cooperating witness.  He asks Gallman isn't
this the guy who took the gun.  That's who Mr. Scarpa is.
You've heard based on the evidence how he has practiced law.
That's who Justice Holder banned from the courtroom.  There's
an obvious need for a significant sentence here.

There are two overarching reasons we gave to your
Honor as to why an upward variance is necessary.  The first
reason is what the guidelines don't account for.  There are
more than enough aggravating factors.  The most serious one is
the bribery that occurred during a serious homicide trial of a
dangerous gang member.  The defendant wanted to free Reginald
Ross who is a cold hearted individual.  He fed puppies to
alligator like creatures in his basement.  That's the man who
he sought to free through unethical means.  There is no
distinction in bribing in that context.

Scarpa's violation of his bond is also not accounted
for in the guidelines.

THE COURT:  His bond?

MR. SPEKTOR:  His conditions of pretrial release.

THE COURT:  You're talking about the call with the

victim.

MR. SPEKTOR: Yes. Judge Tiscione findings of the way he conducted himself during the Ross trial as you heard during this trial. That is not accounted for in the guidelines.

Finally, judge, as you noted when sentencing Mr. Brettschneider --

THE COURT: In fairness we ought to make one thing plain. In Gallman's case the government did not argue this obstruction theory, that it admittedly should have argued. So the court departed upwardly from Mr. Gallman's guideline range. He had a much lower range that Mr. Scarpa faces and I departed upwardly in that context. But this guideline range is much higher. So the force of making an upward departure motion is not as strong as it was in Mr. Gallman's case.

MR. SPEKTOR: That is absolutely right. We asked for a much greater variance in Mr. Gallman's case. We are not asking for that here. Gallman accepted responsibility almost right off the bat when he was charged with his crime. And when you compare their conduct even though the bribery scheme is Gallman's idea and he is the one who meets with Cherry initially, Mr. Scarpa is the one who takes off from there and it becomes his show. Mr. Scarpa's conduct is worse and he has still not taken responsibility.

THE COURT: There are countervailing things on both

sides of the ledger when you compare Gallman to Scarpa. Some favor Gallman. Some favor Scarpa. Although Mr. Scarpa didn't accept responsibility, Mr. Scarpa didn't have the very serious criminal record that Mr. Gallman had and you can make arguments on the other side of the coin, well, Mr. Scarpa had a much more normal upbringing than Mr. Gallman. They pretty much wash out when you consider how they should be treated. There are positive and negative things comparing Mr. Gallman and Mr. Scarpa. It sort of comes out in the end that they are pretty much equivalent.

MR. SPEKTOR: We tried to acknowledge some of the factors that compelled the court to vary in Gallman's case which admittedly are not present here. As you said there are other factors. Mr. Scarpa is an attorney. One thing that you noted in the Brettschneider sentencing the parties did not attempt to compare Mr. Brettschneider's conduct to that of other attorneys. That is what we endeavored to do in our submission. There is marginal utility in comparing other defendants. We have their PSRs and their are individual circumstances. A couple of attorneys in this district, Flom and Cean, those were sentences imposed by Judge Mauskopf and Judge Johnson in this courthouse, both lawyer defendants. In the case of the Flom, where Mr. Edelman was actually the lead prosecutor, he received a 48 month sentence for money laundering where the profit was relatively small. In the case

of Cean, where Margaret Gandy was the AUSA, who is also on this case, she received an 87 month sentence for mortgage fraud. Admittedly the guidelines in those cases were higher. In the case of Cean it was the top of the guideline range, if I recall correctly. For those of us who know those cases well, there's no comparison between the conduct involved in those cases, what those lawyers did, their history and characteristics, and what Mr. Scarpa has done. I think short of violence or issuing explicit threats against witnesses, Mr. Scarpa's conduct was reprehensible as it gets for a criminal defense attorney.

Ross took the lives of two innocent men and the families of those two men really wanted to be here today and with your Honor's permission we will send them a transcript of today's proceeding. They were affected and they were offended by the way that Mr. Scarpa conducted himself. Cherry was laughing at trial as he perjured himself. Now those families learn that Mr. Scarpa bribed a witness during this trial in the hopes of freeing their sons' or brothers' killer. The statements of the defendant that there were no tangible victims in this case is flat out wrong.

THE COURT: They are not victims within the meaning of the Victim Protection Act that they should have notice and been able to participate. Do you agree with that?

MR. SPEKTOR: We did give them notice out of an

abundance of caution.  They are not victims within the meaning of that statute, no.

Judge, the conduct that underlies the convictions and the conduct during the pendency of this case, the way Mr. Scarpa has practiced law I think is reprehensible.  His contempt of the law is shameful.  We think that a sentence of 48 months will begin to meet the factors set out in section 3553(a), including promoting respect for the law.

THE COURT:  Thank you.

MR. COLLELUORI:  One statement, your Honor?

THE COURT:  Yes.

MR. KENNIFF:  Judge, if I may?

Judge, a couple of points in response to that.  I think one of the things that the government didn't mention -- because they talked a lot about Mr. Scarpa's role as an attorney.  That would be double counting under the guidelines because they are getting the extra points, the extra two points for his special role, which Mr. Gallman didn't get.  I think it's appropriate for the court to vary below those guidelines.

It is a difficulty I have with having tried the case -- and I have the utmost respect for the government in this case.  They are wonderful lawyers and wonderful people I think.  There is a lot in their approach to the sentencing in this case, I think in their approach to the initial bail

application, in the approach to get Mr. Scarpa remanded after what they contend was a violation of state law and with all due respect to Judge Tiscione I do not believe state law was violated by Mr. Scarpa's conduct.

THE COURT: I'm still a little built unclear about that. I don't know how it's not at the very least a serious conflict of interest to talk to a victim witness when you represent the defendant and tell them to assert the fifth.

MR. KENNIFF: Judge, a couple of things. You saw me try the case. Your Honor saw my style. It's probably much different than Mr. Scarpa's style. Frankly, with all due respect for Mr. Colleluori, who I have great respect for, it's different from his as well. Having handled many domestic violence cases -- and they present special burdens for I'll say the state practitioner frankly because you do not see many domestic violence cases coming here.

THE COURT: Presumably you can interview. There's nothing wrong with interviewing a witness. The government doesn't contend that's a problem, correct?

MR. SPEKTOR: There's one other issue. She was represented by counsel.

THE COURT: At what point in time?

MR. SPEKTOR: I think by the point they are talking on the phone she already had an attorney.

MR. KENNIFF: Let me touch on it. It's a lesser

point.  The first thing, I don't have the transcript in front
of me.  I remember this pretty well.  I didn't do the
application before Judge Tiscione.  Mr. Razor did.  The first
thing is did you speak with the attorney I referred you to?
That is not only the right way to handle it, it is the
textbook way to handle it.  State prosecutors -- and I'm sure
everyone here is aware of this -- regardless if they spend
more time here or down the street, domestic violence is the
sine qua non of the state system or one of them.  The cases
are prosecuted very aggressively and probably rightfully so.
Having said that, one of the cases where it is routine to have
a recalcitrant complainant either because they have had a
change of heart or certainly in some instances because they
maybe were not completely honest and truthful in the
beginning.

THE COURT:  How can a lawyer representing a
defendant purport to give legal advice to a witness which the
effect of that legal advice is to tell them not to testify, to
assert the fifth, which would have the ultimate result of
exonerating the defendant because there would be no testimony?
I know that a defense lawyer can interview.  There's nothing
inappropriate about interviewing a witness.  How do you give
legal advice to a witness who is going to testify against your
client?  I'm not understanding how that's possibly
appropriate.

MR. KENNIFF: The answer is you don't. I don't believe that's a fair reading. That's the government's characterization of what happened here. Listen to the calls and review the transcript. The first thing Mr. Scarpa says is did you speak with the attorney. The last thing you do if it is truly your intention in that situation to manipulate the complaining witness either by having it fabricated, as they contend he did with respect to Mr. Cherry, or having contact themselves, is to refer them to another attorney. It is without question that that's what he did in this case. The complainant or victim then says to him, which he told me I can plead the fifth, Mr. Scarpa says you are absolutely right, you can. I don't believe that that constitutes legal advice, your Honor. I really don't think that in fairness anyone can say that.

He then talks to her about what that would look like and what the questions are. I don't think anybody's arguing here that it was not incredibly poor judgment particularly, given the burdens of this prosecution that Mr. Scarpa was operating under, to have done that or not to have hung up the phone. There is a fine line between saying that it's aiding and abetting under New York State law. It is not. Another schism, and this is a schism between federal and state law, in this context we're dealing with him operating within state law.

THE COURT: What state law is he operating under?

MR. KENNIFF: The government has tried to imply in this case that he tampered with a witness. The law in New York State, the case law says clearly that advising a witness on how to take the fifth does not constitutes witness tampering. It may in this courtroom in a federal prosecution. My understanding of the law it is quite restrictive. If the government wants to produce a New York State case that indicates that an attorney talking to a witness, which is taking these facts in the light most favorable to a defendant, was all this was, constitutes witness tampering. I don't think they can. And that's one of the reasons why they walked back that argument although they used it in trying to have him remanded and they went with aiding and abetting. The standard may be different under federal law. Under New York State law it's opportuning the crime. That is not what occurred here.

One of the issues we have had throughout this case, one of the issues that came out in the trial -- I respect the jury's verdict. No one is happy about it. It would be inauthentic for Mr. Scarpa to come in and say he agrees with the verdict. It doesn't mean he's not accepting it or taking responsibility for it.

A recurring theme throughout this prosecution -- and you have seen it now with the arguments the government made -- is to bootstrap Mr. Scarpa's unsavory clients with the crime

which he was accused of and now convicted of.  The fact that
Mr. Ross feeds puppies -- I don't know what an alligator like
creature is.  I assume it's either an alligator or not.  Let's
go with alligators.  The fact is he's a homicidal maniac.
That is something that the defendants conceded throughout this
case and it's something that is very true.  I had a hard time
reading the transcript of that trial.  It is horrific.  But
that is the charge of defense attorneys.  I have defended
terrorists in this district or at least next door.  I have
also tried cases in Iraq where the courthouse I was trying the
case in was being bombed by IED's within 100 yards.  It
certainly doesn't mean that I condone terrorism.  It doesn't
mean that Mr. Scarpa condones double homicide or puppies to
alligators or whatever.

He was convicted of bribery and we respect the
verdict that he is here for.  The reality is there is much in
the government's sentencing memorandum that seems to wander
far from general deterrence, specific deterrence.  I would
submit even the guidelines, by their own concession, even with
getting all the enhancements they are still not satisfied.  48
months.  The government can't quantify that number.  Did a
bird fly in the Eastern District and tell them that Mr. Scarpa
should face 48 months.  There is much in the government's
sentencing presentation that has nothing to do with any of the
sentencing factors and frankly reeks a lot more of vengeance.

If there's doubt as to that -- I'm sure the government would disagree -- but I would submit to the court if there's any question with respect to that, turn to the last pages of the government's sentencing memorandum and, first of all, you know, look there's something to be said for when you get to the winner's circle act like you have been there before. There's also something said that you can kick a person but don't kick him when he's down. The government doesn't like when the defendant strays from the facts. The court doesn't like it. I would submit it is reckless to put in a sentencing memorandum without any good-faith basis that Mr. Scarpa is laundering money, evading taxes, not reporting cash deposits.

THE COURT: I didn't see that.

MR. KENNIFF: Talked about it at the end of their sentencing memorandum. Because there's a call that Gallman saying that he received $500 in cash from a client or because there's another situation where they talk about receiving $1,500. I don't think that it's delineated whether that fifteen hundred is cash or not. Let's assume, taking the facts most favorable to the government, that that fifteen hundred dollars was cash. What good-faith basis does the government have to suggest in a sentencing memorandum, to a man that is facing a life in ruin and serious consequences, regardless of where you sentence him, that he's committing tax

evasion.  They didn't use those words.  I don't see any other
inference.  I'm all ears if there is another one.

THE COURT:  I thought it was just under the portion
that asks for a substantial fine.

MR. KENNIFF:  That is where it's under, which brings
to my second point.  There's an inference there that he's
committing an impropriety because he has a Porsche that he
sold to pay for his defense in this case.  He's living a
life-style that is not reporting income or hiding it.  I'll
hand the floor back to the government on that point, if they
want to say they were implying something else and I am missing
something.

THE COURT:  I understood that argument to be
directed principally to the fact that the defendant had the
wherewithal to pay a substantial fine.

MR. KENNIFFF:  Why would they be referring to the
fact that he is receiving what we can all agree at best modest
cash fees?  Why would that alter his ability to pay a fine?

THE COURT:  In any event, I'm not considering the
fact -- there's no proof before this court that he violated
the income tax laws or laundered money.  I don't believe the
government is asking the court the court to consider that.

MR. SPEKTOR:  No, your Honor.  We're asking for a
substantial fine.  You fined Mr. Brettschneider.  He does not
have the same means as Mr. Scarpa and was not convicted of

same conduct.

MR. KENNIFF:  I appreciate the government clarifying that.  I still wonder what the references to cash were.  I will let that part go.

What I won't let go, seeking a large cash fine.  On the one hand they are seeking an upward variance which would be extraordinary on top of basically every sentencing enhancement that they can rationally argue for, what is the purpose of the increased fine if it's not vengeance?  This was not a pecuniary offense.  There's no allegation that Mr. Scarpa profited.  I suppose he received a retainer from Mr. Ross.  But I think he certainly would receive a retainer regardless.  There's no pecuniary quality to this case.  If the government has their way, because this is what the government is asking for, the court will incarcerate Mr. Scarpa for 48 months at a time when he is a sexagenarian and the court will also impose a substantial monetary fine on top of that.

THE COURT:  There's no contention here that he couldn't pay a substantial monetary fine.  I understand your argument that it's not justified and you don't believe it's appropriate.  There's nothing to suggest that he can't pay a fine.

MR. KENNIFF:  I guess a lot of that turns on the term substantially.  Mr. Scarpa can certainly pay a fine.  We

are not arguing that he's indigent.  I do believe it is
eyebrow raising in this context not to only ask for an
extraordinary departure on the sentencing guidelines, an
extraordinary upward variance, to also in the same sentencing
memorandum to argue to the court that after the court
incarcerates him for four years as the government wishes, that
his wife and his family, who now obviously are deprived of the
income from his practice, he receives a modest twenty-nine
hundred dollars a month pension from his generation of service
to the People of the State of New York, that on top of that
they want to see a substantial fine for a nonpecuniary
offense.  For what?  His wife having perhaps lost the love and
emotional and physical comfort of her husband can also be put
in a more precarious economic situation that she was already
put in or a less serious one.

There's frankly other things in the memorandum that
smack more of vengeance than any legitimate sentencing goal.
Marring the language of the defense sentencing memorandum, my
memorandum is characterized as saying Mr. Scarpa accepts only
his associations.  The sentence I used was his associations
and choices, a conjunctive statement.  How do you parse one
part of that and not include the other in a case, frankly,
ironically this has a lot to do where semantics.  Calling his
wife a liar, saying he was a star in Queens.

THE COURT:  Let me clarify that.  I think the point

the government was making was that there were
misrepresentations about the nature of his service in the
district attorney's office.  Did the government correctly
point out that he didn't hold the positions that his wife said
that he did?

      MR. KENNIFF:  Judge, the government -- I will let
Mr. Scarpa speak to that.  He held a title of authority at the
Queens District Attorney's Office.  He became the bureau
chief, in a lateral move moved to Suffolk County.  If you take
a plain reading of the statement, maybe the wife misspoke and
said he was a bureau chief in Queens and went to Suffolk where
he was I believe -- he'll speak to the title.  He was hired in
Suffolk as a chief of the --

      THE COURT:  So he was not a bureau chief in Queens,
is that correct?

      MR. KENNIFF:  That is correct.  But I think the way
that one would deal with a statement like that, rather than
saying that his wife falsely made misrepresentations to the
court, is perhaps his wife misunderstood or perhaps she
misspoke.  Again, your Honor, I'm not going to belabor the
point.

      THE COURT:  Really your comments now should be
directed to what the government said.  I've heard a full
presentation from you.

      MR. KENNIFF:  Those are the final points I want to

make to the court. I urge the court in imposing sentence on Mr. Scarpa to -- we respect the verdict in this case. But to urge the court to sentence Mr. Scarpa based on the totality of the factors, based on the notion that he has been deterred. The deterrence as we pointed out in our sentencing memorandum -- I don't like to repeat what I said in the sentencing memorandum. Your Honor has been sitting through a lot of argument in this case. All of the goals of sentencing in this case are served. I don't think anything would be achieved other than perhaps a vindictive sentence by incarcerating Mr. Scarpa at this time.

As for the sentencing, again, we're asking for a variance. I'm not going to get hung up on the fact that the government is asking for an upward variance on what the guidelines are. Whether the court accepts the government's and the probation's rendition of the guidelines as the court already indicated it has and although we may disagree with that we respect that as well. This is an appropriate case for a substantial downward variance. Mr. Gallman was a career felon, a convicted felon many times over as the government made quite clear. You can question Mr. Scarpa's judgment independent of the crime he was convicted of all day long for getting involved with someone like that, whether his intentions were benign or not in the beginning. He is a very different person. Another codefendant in this case, different

set of facts or guideline range, who was sentenced to a

relatively brief period of community confinement.  I submit

something along throws lines or a longer period of community

confinement would be appropriate in this case, but not federal

prison, your Honor.

        THE COURT:  Thank you.

        I'm going to take a brief recess now before I hear

from Mr. Scarpa.  I think we have tried the patience of the

court reporter here and I'm sure maybe Mr. Scarpa would like a

couple of moments, too.

        We'll resume in about five minutes.

        (Recess taken.)

        THE COURT:  Everyone, please, be seated.

        Mr. Scarpa, do you wish to say anything before the

court imposes sentence?

        THE DEFENDANT:  I do wish to address the court.

Before I do, your Honor, I would ask if you advise me if you

would prefer that I stand or sit.

        THE COURT:  It's fine that you sit because the way

our microphones are set up it's very hard to hear you.  I

certainly don't think that you show any disrespect by sitting.

You can sit and speak into the microphone.

        THE DEFENDANT:  Thank you very much, your Honor.

        Your Honor, I had prepared a set of remarks that I

intended to address this court and I would like to utilize

this as a guide for myself.  But if at any time I don't listen to my own advice to myself, which is to keep it as short and sweet as possible, please, don't hesitate to tell me, Mr. Scarpa, you are going on a little too long and I will certainly truncate my remarks.

First I would like tell you that, your Honor, experience tells me that statements made by defendants in these situations are often evaluated as being self-serving and disingenuous because you know I know what the consequences are here.  I'm painfully aware that you hold my life in your hands and so obviously my comments are motivated to try to persuade you to be as lenient as possible.  That's not a fault, your Honor.  It's a circumstance that I find myself in and there's no other opportunity or way for me to address you.

To say that the words are just mere words, well, that's all I have at this point.  I have no opportunity to show you by conduct who I really am and how I came to be in this predicament.  First, I want tell you that I am deeply humiliated, certainly humbled.  I would like to apologize not only to you but to the entire bar.  I was a very proud lawyer. It is a noble profession, your Honor.  And to the extent that I have brought any disrepute the to the bar is something that weighs extremely heavily on me.  And I think that you can understand why as a member of the bar you know how we conduct ourselves reflects on a profession that even though we know

it's noble it's often held in disrepute.

I want to apologize to my wife Carey, to my children, Jennifer, Michael and John, to all of my grandchildren, to my family and to my friends and to society for all the actions that I have committed that caused this great harm. I stand before you ready to accept what you believe to be the appropriate punishment. Because I believe as we all do that our justice system requires that there be punishment for bad conduct.

Of course what is the appropriate punishment is ultimately to be determined by you. But let me explain something, judge. How did John Scarpa get to be here? Who am I as a person? Let me speak to you directly, human being to human being. And I mean that as no disrespect to the very honorable, high position that you take. I John Scarpa have taken pride in my ability to be a good judge of men and of my knowledge of the criminal law. But the as the age old proverb warns it is pride that goes before the fall. Just like in a Greek tragedy it's my own character flaws that have proved to be my downfall.

What are these character flaws? I thought that I was an excellent judge of human beings. I thought I was an excellent judge of the law. Unfortunately, I was wrong on both accounts, much to my chagrin. I thought that TA and others like him, I could be an ennobling encounter for them,

that -- I want to take two seconds to digress.  You know how I met TA, I was in Scott Brettschneider's office when Scott Brettschneider and John Russo were talking to a guy, you know the name, Richard Marshall.  He called him Lef.  While I was there I met TA for the first time.  I was working for Scott at the time.  I had just come out of the district attorney's office, having left of the Suffolk DA's office as a bureau chief.  Sitting in Scott's office when we get a telephone call that TA has been arrested in Queens County and as God is my witness they turned around and they said, well, let that crackhead sit.  I looked and said, Are you guys kidding me? How can you just have somebody sitting there as a friend and do that.

I went and pro bono I represented TA.  It turned out we got a good result in that and TA was not convicted.  He felt to loyal to me, so appreciative of the fact that I would represent him for free that he latched on to me and we talked about his son.  We talked about his mother.  I found that he was the most well-read individual that I had ever met in my life.  He had 18 years in state prison to do a lot of reading. There was a lot more to him and I felt a growing affection for him.  Never once in my life did I think that TA was out doing anything untoward during this period of time.  He was encyclopedic in his knowledge of the law.  He was good.  He could tell you what book and page number cases were on.  He

was the first one who brought Crawford to my attention.  I
felt I had a good effect on him.  I hoped I lifted him up out
of the life that he had been living and things would have
changed.  Boy did I cry when I learned the time he was
actually stealing files from me, stealing money from me.  He
could have asked me and I would given to it to him.  I paid
for his mother's rent down in South Carolina for a long time.
I treated him like a brother and he called me a brother.  I
thought I could give him meaningful work to do and I could
trust him to respect me and to help lift him up and boost his
self-esteem.  I was profoundly wrong.

As to my knowledge of the law I'm even more
chagrined.  I never thought nor did I think in any way -- TA
is a kind of street character.  He grew up in the hood.  His
father was murdered.  His brother was murdered.  He had a
terrible existence but he had one shining light in his life,
that was his son Tasheen.  I took Tasheen into my office.  I
taught him how to do legal research.  I helped him get into
LaGuardia College.  TA was so proud of the fact that his son
had gone to college.  It was amazing.  I also knew the man
well enough to know he was a puffer, taking credit for
everything.  I'm going to make this guy good and I'm going to
do that.  It was all BS.  It was all street talk.

When TA -- when I heard that he made this tumeric
offer that he was going to somehow make Cherry good, that

wasn't why he was sent to Cherry.  I was on trial in front of
Judge Condon.  Judge Condon knew, with all due respect, that
Louis Cherry had to be in a witness in the case.  Reginald
Ross had made the judge overtly aware of the fact that he had
to testify.

THE COURT:  Can I stop you for a moment, Mr. Scarpa?
I take it you are making these comments that you are making
now with the understanding and advice of counsel, because you
should understand if for any reason there were a new trial
granted that the statements that you are making about this
about this can be used against you.  I'm concerned you didn't
take the stand in the case and you now seem to want to take
the stand before me.  I want you to understand this could be
problematic for you in the future.

THE DEFENDANT:  I appreciate the warning, your
Honor.

MR. KENNIFF:  Let's have a moment.

THE DEFENDANT:  I'll take the advice of my counsel
and change the subject.

THE COURT:  I'm not inhibiting you from saying
anything you want to say.

MR. KENNIFF:  If I can have a brief moment.

THE COURT:  Sure.

(Pause.)

THE DEFENDANT:  Suffice it to say, judge, that on

the advice of my own conscience and my attorneys I'll move on to a different subject more personal to me.

THE COURT: You understand that I was not preventing you from talking about it. Just so you understand.

THE DEFENDANT: With the danger of sounding like sycophant, you have shown the utmost patience and I appreciate it if you show me a little bit more as I conclude these remarks.

No matter what happens, judge, it is beyond argument that I acknowledge my errors. I should have been more cognizant of what TA might have done. I should have supervised that situation a lot better and I should have understood more deeply the conversations that we had. But at no time did I ever under any circumstances actually think I was bribing anybody nor did I think that he did. That's a mistake on my part. It was a misfeasance. It was not a malfeasance.

I will tell you, judge, that on September 25, as I recall, at 6 o'clock in the morning, I was shaken out of my bed by the pounding on the door of FBI agents who had swarmed to my house fully armed and vested in what was the most shocking thing that could possibly have happened to me because I had already consulted with Mr. Colleluori, after the results of seeing that Mr. Brettschneider had been arrested and that Mr. Goldman had already been arrested, we were

proactive and I asked Mr. Colleluori to call the U.S.
Attorney's Office and he did and offered to surrender me if
they ever wanted me for anything.  Instead of that, judge, I
was not given the courtesy of surrendering like
Mr. Brettschneider or like so many other people.  They invaded
my house.  They traumatized my wife to the point where she
suffers from posttraumatic distress disorder.  She can't stand
to be alone.  The pain and agony that I caused that because
somehow I was not good enough to make sure -- I should have
walked to the U.S. Attorney's Office myself to spare my family
that.  She's a changed woman because of it and she didn't do
anything wrong.  She did nothing wrong and they punished her
in an attempt to intimidate me.

So, please, while I appeal at this point to your
mercy and to ask for your leniency, please, take into
consideration the terrible suffering that we have already gone
through.  I've lost everything that's important to me in a
professional sense, judge.  Thank God I have not lost the love
of my family, the support of my bishops and priests and all
the sisters who are here in support of me.

And so I want you to know, judge, that there's no
possibility of recidivism on my part.  I lived a very good
life before this.  I have tried to be charitable.  It was
embarrassing to me to listen to Mr. Colleluori talk about the
things that I have done.  I didn't do them for that.  I didn't

want anybody to know about the pro bono work that I had done. It was not for that reason, not to be bragged about. Nevertheless, if you are taking into consideration my whole life then it's something you could take into consideration, judge. Veterans, police officers, nobody ever had to pay a fee at John Scarpa's office for anything that they were charged with except I would not represent people on domestic violence cases. I would recommend that they go to the Legal Aid Society or something else like that. I am very much against that kind of conduct.

So, I am perfectly willing, judge, to attest, aver and swear to you that I am not a threat to society and I would like to perform community service and to be able to help my wife and to continue to help my grandchildren. I pray that you find this acceptable and again I am greatly sorry for the harm that I have caused. In the final analysis, judge, I pray deeply for your mercy.

My incarceration of course would affect me most directly and profoundly and I am very, very scared at this moment but I fear even more the effect it would have on my family. So please consider that through all the years that I served the public as an Assistant District Attorney. Let me correct something, your Honor. When I was in the Queens County District Attorney's Office where I served for almost 22 years, I held the position of the highest esteem.

THE COURT: In which district attorney's office?

THE DEFENDANT: The Queens District Attorney's Office. I started there as a CLI, criminal law investigator. I was not even yet admitted. While I was still unadmitted I got to try an against I case against the famous William Kunstler. Subsequently I was able to try and given the responsibility of trying some of the most serious cases in Queens County. The famous stun begun cases, where police officers in the 116 precinct had been stunning prisoners and it was a worldwide, world famous case. I tried John Gotti Junior. I tried the Saporito and Steven case against highway cops who had been involved in criminality. I tried the single largest land waste in case in the history of the state. To say that I didn't have a distinguished career, I left the Queens District Attorney's Office as a Senior Investigative Assistant District Attorney. I was drafted by the Suffolk County District Attorney's Office into the violent crime unit based on the work I had done as the chief of the environmental crime unit in the Queens District Attorney's Office. I was the chief of that unit. We made the largest case in the history of the state.

I left the Suffolk County District Attorney's Office to go into private practice. And in private practice, judge, I tried to conduct myself in a manner which would bring great credit to the bar. But nevertheless, judge, I am a person

with clay feet.  I failed and I am deeply apologetic.  I'm so sorry and I ask you to be as lenient with me as you possibly can, judge.  So under the circumstances, considering the fact that I am now 66 years of age, a little wiser, a little older, but my health is declining and I don't know if anybody has addressed that yet, judge.  I suffer from irritable bowel syndrome.  I suffer from gerd.  I suffer from a lung illness. I'm on special medicine now to try to help with my breathing. I suffer from very, very severe case of sleep apnea, I was told my breathing stopped fifty times an hour.  So incarceration places on me a very special fear.  I don't want to die in jail when my grandchildren are around.

I know this sounds like a very self-serving statement.  It's not.  It's true.  Please, be merciful.  I want to thank you and all those who came in support and I submit myself to your mercy.

THE COURT:  Thank you, Mr. Scarpa.

The defendant here stands convicted of serious offenses which have been discussed here, in his use of interstate messaging, a cellphone to facilitate and carry out the crime of bribery.  He also stands convicted separately of conspiracy to engage in that offense.

Procedurally, the first thing that the court has to do is to determine what the appropriate guideline range is and early on in what has been a very lengthy sentencing proceeding

the court made a determination that the guideline range here was 30 to 37. As the court I understand quite clearly that I am not bound by this guideline range, that in addition to the guideline range that the court should consider the factors under 3553 of Title 18, 3553(a), in determining what the appropriate sentence should be. I fully recognize that I have the authority after analyzing those factors to either go below the guideline range as the defendant requests or to go higher than the guideline range as the government requests.

Here for reasons that I will explain I believe a sentence within the guideline range is one that is sufficient but not greater than necessary to comply with the purposes set forth in paragraph two of 3553.

First of all, let me turn to the seriousness of the offense. This offense or offenses in this court's view represents a perversion of the judicial system by a lawyer who was sworn to uphold that system.

I also don't believe that this constitutes aberrational conduct as has been argued to the court. Within the context of the Ross trial itself, in addition to the bribery of Cherry to testify in a way that exculpated Mr. Ross, there were also discussions about undermining a witness for the prosecution by having members of a Queens gang come into court to seek to intimidate that witness. Those conversations that I listened to, it was apparent that that

was the purpose of having these people come in. It was not just to have the community come watch the trial. It's clear to me, listening to those tapes, that that was for the purpose of intimidation.

There were also conversations that suggested that efforts would be made to cross-examine the witness Anderson about crimes that he had not committed and that the defendant knew that he had not committed. So within the context of the Cherry trial itself there were other actions taken by the defendant in this case that are very troubling.

With respect to the question of the defendant's conduct while on supervision in this case, whether that conduct rose to the level of a crime, may well be debatable. It was certainly in this court's view not conduct that was ethical and certainly along the lines of conduct which was meant to protect a client at the expense of the judicial system and in the correct operation of the judicial system.

As the government pointed out, once the defendant knew that the victim was on the phone and knew that there was a protective order, although it was not the defendant who got her on the phone, still at this point in time it was not at all appropriate for the defendant to engage in the discussion about taking the fifth amendment. And it was more than just reminding her that she could take the fifth, which may have not been that problematic or even a conversation about what

her lawyer had told her. It bordered on actually coaching the witness. There's a whole part of the conversation where Mr. Scarpa says you have a right to remain silent and anything you say could or would be used in a court of law against you and it could expose you to a crime. Now, what's your name? You take the fifth. Right then the victim goes aha. Mr. Scarpa continues, but did you know -- were you involved in an incident with Warner Wells? You take the fifth. The victim says aha. Scarpa says you understand what I am saying? You can take the fifth as to anything that has to do with between you and Tutti. That's a little bit more than reminding someone that they have the right to take the fifth.

I find whether that constitutes a separate crime I only raise this issue because I think the conduct is problematical and underlies any claim here that this conduct was aberrational.

Counsel made a comment about his relationship with Mr. Gallman and certainly there's no guilt by association here. The conduct that Mr. Scarpa engaged in himself, his own conversations, is what convicted him here. Also I just have some problem with the comments that Mr. Scarpa made about seeking to ennoble Mr. Gallman. I sat here and listened to the conversations between Mr. Gallman and the defendant and there was not much ennobling about the conversations that I listened to. I think the tapes made plain that Gallman was a

man with a criminal record and he was fixer.  He was someone
whose value to the defendant was to bring him business, which
of course in itself would not have been a problem.  But his
other use was to pervert the judicial system by using his
criminal connections to both intimidate witnesses and to make
offers of bribes to witnesses.  So the relationship itself,
they worked together as defendants in this case and I think
that bears saying when there's discussions about Mr. Gallman
and the fact that the defendant sought to ennoble Mr. Gallman.
That doesn't seem to be how I view it.

In considering the 3553(a) factors, I have talked a
bit about the seriousness of the offense.  Bribing a witness
is a very serious offense, even more serious when it's done by
a lawyer.  The sentence has to promote respect for the law.  A
sentence of probation as requested by counsel would not in
this court's view promote respect for the law.  Our system of
justice depends on ethical lawyers who fight vigorously for
their clients but do not cross the line as the defendant did
here, who do not seek to pervert that system as the defendant
sought to do here by seeking to have a witness perjure himself
to exculpate a remorseless murderer.

Justice is not promoted by letting such a grievous
crime, a grievous crime that the defendant committed here, to
be treated with that type of leniency.

I have to say as well that there were parts of the

defendant's submission made to the court that I found
troubling.  With regard to the fact that probation did not
initially recognize that the enhancement of obstruction of
justice applied, the submission by the defendant says at page
five that the probation department implicitly recognized the
difference between a zealous defense and concealing a murder.
Indeed, nothing Mr. Scarpa did went towards concealing a
murder but rather to create doubt as to who actually committed
a murder.

I find that statement very troubling.  Obviously,
the murder in that case could not have been concealed.  The
victim was lying in the street dead.  The whole question that
had to be addressed was who did it and the answer to that
question was what Mr. Scarpa sought to corrupt by knowingly
putting on a witness that he and Mr. Gallman had bribed to say
that his client did not do it.

Another argument that counsel made at page seven,
while purportedly not seeking to minimize the seriousness of
the offense, an argument was made at page six and seven and
the gist of the argument was that the defendant couldn't have
thought that the perjured testimony would work because it was
so incredible.  He was just attempting to fashion a defense
out of impossible facts.

These types of arguments suggest that even to this
date that the defendant fails to recognize the gravity of the

conduct of which he was convicted. It is one thing to argue
that the evidence wasn't sufficient in this case to convict
him. That's an argument that he is entitled to make, fully
entitled to make. It's quite another thing to argue that even
if I did the acts as they were charged it really wasn't a big
deal. The answer to having a case with impossible facts is
not to suborn perjury but to either enter a guilty plea or
make the government prove its case at trial.

When we talk about issues of deterrence, that's
another factor that this court has to consider under 3553 and
I agree that with regard to the question of specific
deterrence -- that means deterrence of Mr. Scarpa himself --
that it may well be with the loss of his license that the
considerations of specific deterrence do not weigh against
Mr. Scarpa. But the court too has to consider general
deterrence. Lawyers come to learn sentences imposed upon
other attorneys and a significant sentence would give them
pause about engaging in this type of conduct in an effort to
have their clients acquitted to burnish their reputation as
criminal defense attorneys. I think that deterrence is a
significant consideration here.

Another factor that the court has to consider is the
need to avoid unwarranted sentencing disparities among
defendants with similar records who have been found guilty of
similar conduct. The government in their letter has pointed

out a whole series of cases in which lawyers have been
sentenced.  It's very to weigh that because the court doesn't
know what all those other lawyers did or their personal
circumstances.  The one comparison here is to Mr. Gallman and,
as I said earlier on that, I think that there are factors that
are competing factors.  In some ways Mr. Scarpa is more
culpable than Mr. Gallman because of his role as an attorney,
because of his background.  On the other hand, Mr. Scarpa did
not have the criminal record that Mr. Gallman had.  So
comparing them is difficult, but the court in looking at both
defendants does not find that there should be any big
disparity between the sentences imposed on those two
defendants.

        With respect to history and characteristics of the
defendant, the defendant had a stable upbringing, a stable
marriage.  He has apparently a wonderful family.  There's
nothing about his personal situation that suggests that there
was any mitigating factor here.  I don't believe that it's
been shown, for instance, that he has serious health problems
that other defendants might have or some deficiency in his
background that would explain having become engaged in this
conduct.

        I recognize that there are a number of people here
in support of Mr. Scarpa.  I certainly do not doubt their
sincerity about what they say about the defendant.  But in

determining sentencing the court has to balance important factors and these individuals did not sit here at this trial and listen to the evidence that this court listened to. The seriousness of the offense I think is an important factor to consider here. As I say, it weighs more heavily than the recognizable or the good work that I recognize the defendant has done.

I also recognize that sadly a sentence of imprisonment always implicates people other than the defendant. Of course his family and his children will be very upset by a sentence. That again cannot be used as a factor to not impose a sentence that the law otherwise calls for. And there are here no extraordinary family circumstances that would suggest that there be some sort of variance or departure.

I have tried to take into account as well as I can all of the factors under 3553. Hopefully, I have articulated them in a way that can be understood. I think that under all of the circumstances that a reasonable and appropriate sentence, considering both the defendant's arguments as well as the government's arguments, I'm going to impose a sentence, commit the defendant to the custody of the Bureau of Prisons for a period of 30 months, to be followed by a three-year term of supervised release. That's on count three. The same sentence to run concurrent in count four. I'm going to impose

a fine of $10,000 on count three.  The same fine will be on
count four, but it will be a concurrent fine.  So the fine
will not exceed ten thousand dollars.

I'll place the defendant on supervised release for a
period three years.  I'll impose a one hundred dollar special
assessment which I'm required to impose on each count for a
total assessment of $200.

Again, with respect to the fine of $10,000, the
report more than substantiates that the defendant has the
ability to pay that amount.

Let plea ask the government:  Have I overlooked
anything?

MR. SPEKTOR:  No, your Honor.

THE COURT:  Mr. Scarpa, as I'm sure you know, you
have the right to appeal your sentence.  Any notice of appeal
would have to be filed within fourteen days.

Do you understand that?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Are you prepared to surrender today,
Mr. Scarpa?

MR. COLLELUORI:  No, your Honor.  I was going to ask
that he be kept out until after the holidays, under Rule 28
that he be allowed to postpone his entry until after his
appeal.  We feel this is a close case, that as the court has
indicated, we will have a good shot on appeal on a number of

different issues.

THE COURT:  What provision of the Bail Reform Act are you making reference to?

MR. COLLELUORI:  It's not the Bail Reform Act.

MR. SPEKTOR:  Section 3143.

MR. COLLELUORI:  Yes.

THE COURT:  I take it the government doesn't oppose a voluntary surrender.  Do you oppose the staying out on bail pending appeal?

MR. SPEKTOR:  Absolutely, your Honor, we oppose that.

THE COURT:  What is the standard?  Look at it.

I think it's 3143(b), is that correct?

MR. SPEKTOR:  That's right, your Honor.

THE COURT:  Has to show by clear and convincing evidence the defendant is not likely to flee and that the appeal is not for the purpose of delay and raises a substantial question of law or fact.

MR. SPEKTOR:  Judge, I don't think there's a substantial question of law or fact that is likely to result in a reversal or new trial in this case.

MR. COLLELUORI:  I still believe that the alleged offer to bribe the witness was not an offer that gave him anything he didn't have already and that it was not an offer of substance in any way shape or form.

I further believe that the court allowed the U.S. Attorney's Office to use certain tapes, specifically the one of Gallman and Mr. Scarpa talking about the courtroom and having the defendant's family members there, which was originally meant to, as I understand it, finish -- complete the narrative. The government played that at the summation and as a response to our summation and misused it in their rebuttal to make it as if it were primary evidence. I believe that is going to be found by the court to be prosecutorial misconduct for that purpose.

Additionally I believe there are some issues concerning the sentence. We definitely oppose.

THE COURT: What issues with regard to the sentence?

MR. COLLELUORI: The findings --

THE COURT: The guideline range?

MR. COLLELUORI: Yes. Thank you.

And also there's a jurisdictional issue and also as to the Travel Act as the court knows there's a split in the districts as to whether or not an intrastate phone call violates the Travel Act as opposed to an interstate phone call.

THE COURT: I don't think there's a problem with this district.

MR. COLLELUORI: There's a circuit dispute.

THE COURT: The Second Circuit is the one we're in.

MR. COLLELUORI: We intend to go as far as we can with it. That's part of it. That's something that the court, the United States Supreme Court, may take up given the split in the circuits. I believe that there was a discussion at the American Bar Association this year by one of the justices but I can't recall off the top of my head, but I believe that is an issue that they are looking at.

THE COURT: Does the government want to be heard on that?

MR. SPEKTOR: I'll be brief.

With respect to the 404(b) issue, we have addressed this in our Rule 33 response. The standard on appeal is deference to the decision of the district court. With respect to the Travel Act, the jurisdictional issue, I believe there's only one circuit, if I'm correct, that's gone the opposite way. The Second Circuit's rule is well established and I don't believe there's a question on that issue. I don't believe the defendant satisfies the standard laid out in Section 3143.

THE COURT: I think that is correct.

Although the defendant may be able to establish that he's not likely to flee by clear and convincing evidence, he also has to establish that there is a substantial question of law or fact likely to result in reversal, an order for a new trial or a sentence does not include a term of imprisonment or

a reduced term of imprisonment less than the total time already served, plus the expected duration of the appeal process.

I don't think that a substantial question of fact or law has been raised. The standard on a Rule 29 argument is extremely high. With regard to similar act testimony, again, as counsel points out, it's a discretionary decision by the court. That evidence that was submitted dealt with both intent, is my memory of it, as well as telling the whole story of the trial, because I was intimately connected with the trial Cherry testified in, the Ross trial.

I think in terms of a finding of the guideline range here I don't think that there is a real substantial question of fact or law that the court erred in determining the guideline range and since the defendant received a sentence at the lower end of that range, that also obviously would not be a strong appellate issue. So, I'm going to deny that.

Do you want a direct surrender to the institution?

MR. COLLELUORI: Yes. We request a close-by institution.

THE COURT: Okay. Ms. Holley, what would be the usual time?

THE CLERK: Six weeks.

THE COURT: Which would be what?

THE CLERK: November 4.

MR. COLLELUORI:  I'm going to ask to allow him to spend the holidays, Christmas and Thanksgiving, with his family.  He can surrender mid-January without a problem.

THE COURT:  Often it takes time for the Bureau of Prisons to make these types of assignments.  So I will direct that the defendant surrender by January 3 to the designated institution.

Mr. Scarpa, you of course understand that the conditions of your bond are still in effect and remain in effect until you surrender to the institution.  Do you understand that?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Anything else?

MR. SPEKTOR:  No, your Honor.

MR. COLLELUORI:  He's to continue to report to pretrial?

THE COURT:  Yes.

MR. COLLELUORI:  Thank you, your Honor.

                    Ooo0Oooo0